**UNITED STATES of America,
Plaintiff-Appellant,**

v.

**Herman Edward TINKLE, Jerry Nelson
and Charles Richard Garrett,
Defendants-Appellees.**

No. 80–1877.

United States Court of Appeals,
Fifth Circuit.
Unit A

Sept. 8, 1981.

Rehearing and Rehearing En Banc
Denied Oct. 20, 1981.

---

James R. Gough, Asst. U. S. Atty., Houston, Tex., for plaintiff-appellant.

Robert A. Shults, Houston, Tex., for Tinkle.

Robert S. Bennett, Houston, Tex., for Nelson.

Charles S. Szekely, Jr., Asst. Federal Public Defender, Roland E. Dahlin, II, Federal Public Defender, Houston, Tex., for Garrett.

Before INGRAHAM, POLITZ and WILLIAMS, Circuit Judges.

POLITZ, Circuit Judge:

Herman Edward Tinkle, Jerry Nelson, and Charles Richard Garrett stand indicted for conspiracy to obstruct the communication of information by Peter Kalfas to a criminal investigator of the Alcohol, Tobacco and Firearms Division of the Treasury (ATF), and to injure Kalfas for giving such information, in violation of 18 U.S.C. § 1510. They are also charged with carrying firearms during the commission of the conspiracy, in violation of 18 U.S.C. §§ 371 and 1510. Garrett, a convicted felon, is charged with receiving a shotgun and pistol which had been transported in interstate commerce, in violation of 18 U.S.C. §§ 922(h)(1) and 924(a). Nelson, a convicted felon, was charged with unlawful possession of the shotgun and pistol, in violation of 18 U.S.C.App. § 1202.

Claiming Fourth Amendment violations, the defendants moved to suppress (1) the shotgun, pistol and ammunition found in the automobile occupied by Tinkle and Garrett at the time of their arrest, (2) a statement made by Tinkle at the time of his arrest, (3) statements by Tinkle made several hours after the arrest, (4) statements by Tinkle and Garrett made on the fifth day after the arrest, and (5) the results of a photo identification of Nelson made by Tinkle on the fifth day after the arrest. The trial judge granted the motion to suppress as it related to the weapons, ammunition, and statements made by Tinkle at the time of his arrest and shortly thereafter, but denied defendants' request for suppression of the other evidence. The government appeals the trial court's order. 18 U.S.C. § 3731.

We conclude that no constitutional violations occurred in the course of the stop and warrantless arrest of Tinkle and Garrett. To the contrary, we are impressed with the quality of the law enforcement work reflected in the record. Since the challenged evidence should not have been suppressed as the fruit of an illegal arrest, we reverse.

*Facts*

The duties of Treasury agents include providing protection for dignitaries. In the

Houston area this includes the President, Vice-President, presidential candidates, and high government officials and heads of state visiting Houston for medical reasons. Local ATF agents bear a substantial part of the responsibility for securing the safety of these visitors. ATF agents also provide protection for persons furnishing information in criminal investigations they are conducting.

Peter Kalfas was a key source of information and a witness in the investigation of an arson ring that involved a large number of people. He provided evidence to both state and federal authorities. The investigation led to charges against Raymond Conti and Roland Sarvaunt. Kalfas was scheduled to testify as a prosecution witness at Conti's trial. Many others were targets of the continuing investigation and, at the time of the suppression hearing, were apparently on the verge of being indicted.

In September of 1979, Conti and Sarvaunt told ATF Agent Randy Cunningham that one or more of the persons under investigation had "put a contract" on Kalfas' life. They informed Cunningham that some of the people under investigation had been contacted by persons offering to kill Kalfas for payment. Cunningham, impressed by this information, advised Kalfas of the threat and began an informal, loosely coordinated surveillance of Kalfas. This included frequent telephone communications and some face-to-face exchanges in which he advised Kalfas on measures to avoid unnecessary risks. This early assistance included the spot checking of Kalfas' residence and business by ATF agents. In October 1979, after discovering that Kalfas was being watched furtively, the agents began counter-surveillance which increased in scope and intensity over the ensuing months. As the trial of Conti neared, the effort involved 15 agents and provided continuous protective coverage. The agents observed several persons, including Conti, watching Kalfas.

Between September of 1979 and March 13, 1980, the date of the arrests at issue, Cunningham and other agents sought to ascertain the identifies of the persons seeking funds to kill Kalfas. They checked the license plates of vehicles containing persons watching Kalfas and found more than one-half to be stolen.

Cunningham was suspicious of Conti's motives; he believed that Conti had reported the plan to kill Kalfas as a cover for himself. Consequently, Conti was never told that Kalfas was under protective surveillance, and Cunningham was of the opinion that Conti was unaware of the agents' activities.

Conti's trial was scheduled for Monday, March 17, 1980. On Thursday, March 13, 1980, agents observed two men watching Kalfas from a blue Dodge parked near Kalfas' business. At one point, when Kalfas passed the Dodge on the way to his vehicle, the passenger appeared to shield his face from Kalfas. This was reported to Cunningham when he came to the area to check with Northcutt, the agent then on duty watching Kalfas. Although the agents had seen persons observing Kalfas before, Cunningham's concern about Kalfas' safety intensified. The impendency of the trial, the manner in which the occupants of the blue Dodge acted, weighed in light of the information collected over a period of months, combined to cause Cunningham to conclude that the threatened assassination attempt might be at hand.

After conferring with Northcutt and Kalfas, Cunningham devised a plan to determine if the occupants of the Dodge intended to do more than merely observe Kalfas at work as the previous watchers had done. He told Kalfas to depart from his business and drive to a remote subdivision 18 miles away. He instructed Northcutt to follow closely behind Kalfas and, if the Dodge followed and tried to draw abreast of Kalfas, he was to prevent the maneuver by ramming the Dodge, if necessary. These instructions underscored the seriousness with which Cunningham viewed the situation. Cunningham then departed the parking lot ahead of Northcutt and Kalfas, drove a short distance away, and positioned his vehicle where he could see, but not be seen by, passing vehicles.

In a few minutes Cunningham noted Kalfas pass, followed by Northcutt. A few vehicles passed and then the blue Dodge came into view. Cunningham pulled into the chain of traffic where he could see the movement of the Dodge. It was obvious that the Dodge was following Kalfas or Northcutt; the driver repeatedly drove into the oncoming lane of the two-lane highway to get a view of traffic ahead and pulled over the center line to look down the road when stopping for traffic lights or signs. At one point, while the Dodge and Cunningham were stopped by a light, Kalfas and Northcutt disappeared from view. The Dodge was driven at a high rate of speed to overtake them. Apparently this was the first time that the persons who had been watching Kalfas actually followed him when he departed his home or business place.

When it became clear to Cunningham that the Dodge was following Kalfas or Northcutt, he radioed for help. He contacted two other ATF agents in the vicinity, Allen and Taylor, told them that Kalfas was being followed, and informed them of the destination. He instructed the agents to go to the remote subdivision and position themselves so that they could observe traffic. He further instructed the agents to cover Kalfas as he entered the subdivision; if the Dodge followed Kalfas into the subdivision they were to stop and arrest the occupants. Taylor and Allen quickly went to the designated place and waited.

As the convoy approached the subdivision, Cunningham radioed Northcutt and told him that after exiting the interstate highway he was to continue along the service road and not enter the subdivision. This maneuver was to make certain that the Dodge was following Kalfas and not Northcutt. When Kalfas turned to enter the subdivision, the Dodge, in line behind Northcutt, quickly turned left from the wrong lane and followed Kalfas.

As Kalfas neared the intersection at the subdivision entrance, agents Taylor and Allen took their positions in the traffic flow; Taylor pulled behind Kalfas, followed by the Dodge, in turn followed by Allen. Taylor hesitated at the subdivision entrance long enough for Kalfas to drive from view, then proceeded straight through the intersection, watching the Dodge as he did so. The occupants of the Dodge hesitated at the intersection, looked in all directions, and finally turned right. Allen followed. Taylor turned around, returned to the intersection, and followed Allen. The Dodge was proceeding very slowly; the occupants were looking in each driveway. The pace was so slow, five or six miles per hour, that Allen felt compelled to pass in order to avoid suspicion. He radioed Taylor, who was approaching from the rear, of his move.

The three vehicles proceeded in line—Allen, the Dodge and then Taylor—down a narrow subdivision street to a stop sign. At that point Allen raised his radio microphone to speak to Taylor. The driver of the Dodge, apparently seeing the microphone, reacted by backing up very rapidly, narrowly avoiding Taylor's vehicle. The Dodge was now blocked by the two agents' vehicles. Both agents exited their cars with weapons in hand, identified themselves, and told the occupants of the Dodge that they were under arrest. As soon as the Dodge came to a stop, Tinkle, the driver, lifted his hands and placed them on or near its inside roof. Garrett, the passenger, had one hand down next to his side and was watching Allen approach. Taylor, seeing a shotgun near Garrett's hand, warned Garrett not to try anything. Garrett then raised his hands. Tinkle and Garrett exited the Dodge and were handcuffed. The agents retrieved a 12-gauge shotgun from the floorboard between the passenger seat and the door, and a .38 calibre pistol from the floorboard under the driver's seat. They also retrieved buckshot ammunition for the shotgun.

Cunningham had driven into the subdivision from another entrance and, after assuring Kalfas' safety, joined agents Taylor and Allen immediately after they had effected the arrest. At the scene Tinkle made an inculpatory statement. Several hours later this statement was reduced to

writing, by two separate amanuenses, and signed.

This appeal poses the question whether the stop and arrest of Tinkle and Garrett contravened the command of the Fourth Amendment that "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated . . . ." The answer to this question turns on whether the warrantless arrest was supported by probable cause or flowed from an investigatory stop permitted by *Terry v. Ohio*, 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968).

### Probable Cause

■ The definition of probable cause is easily stated: probable cause exists whenever the facts and circumstances known to the officer, and of which he has reasonably trustworthy information, are sufficient to warrant a person of reasonable caution to believe that an offense has been or is being committed. The currency of probable cause is probability, not legal certainty; it may exist even though the evidence before the officer is insufficient to convict. *Brinegar v. United States*, 338 U.S. 160, 69 S.Ct. 1302, 93 L.Ed. 1879 (1949); *Carroll v. United States*, 267 U.S. 132, 45 S.Ct. 280, 69 L.Ed. 543 (1925). But even though the controlling principles can be broadly stated, they are not so easily applied; a determination of whether probable cause exists requires a close examination of the facts and circumstances presented in each case. And as our colleagues of the District of Columbia Circuit observed, "the decision in one case seldom furnishes a pat answer in another." *United States v. Young*, 598 F.2d 296, 298 (D.C.Cir. 1979). For this reason the quest for probable cause, as the predicate for valid arrests, searches, and warrants, is one of the most frequent exercises undertaken by lawmen, lawyers and judges.

■ In the determination of probable cause, several considerations afford guidance. A valuable benchmark is the admonition that probable cause is to be determined "not with the logic of cold steel, but with a common sense view of the realities of everyday life." *United States v. Agostino*, 608 F.2d 1035, 1037 (5th Cir. 1979). The probabilities with which we deal "are not technical; they are the factual and practical considerations of everyday life on which reasonable and prudent men, not legal technicians, act." *Brinegar v. United States*, 338 U.S. at 175, 69 S.Ct. at 1310. In addition, determining whether probable cause exists involves a consideration of time. As the Supreme Court stated in considering the constitutionality of a warrantless arrest, the validity "depends in turn upon whether, at the moment the arrest was made, the officers had probable cause to make it . . . ." *Beck v. Ohio*, 379 U.S. 89, 91, 85 S.Ct. 223, 225, 13 L.Ed.2d 142 (1964). *See United States v. Savage*, 564 F.2d 728, 732 (5th Cir. 1977).

■ In the present case, the trial judge found probable cause did not exist at the time of the arrest because he concluded that the informant (Conti) was not trustworthy, the information furnished was not sufficiently reliable, and the other factors—an occupant of the Dodge attempting to hide his face and the trailing of Kalfas 18 miles to the subdivision—were not sufficient to justify the arrest. But in analyzing whether probable cause exists we must consider all of the relevant factors viewed from the perspective of the arresting officer. Particularly significant to the instant inquiry is the Supreme Court's directive: "In all situations the officer is entitled to assess the facts in light of his experience . . . ." *United States v. Brignoni-Ponce*, 422 U.S. 873, 885, 95 S.Ct. 2574, 2582, 45 L.Ed.2d 607 (1975). *See United States v. Ortiz*, 422 U.S. 891, 897, 95 S.Ct. 2585, 2589, 45 L.Ed.2d 623 (1975); *United States v. Orona-Sanchez*, 648 F.2d 1039 (5th Cir. 1981); *United States v. Pacheco*, 617 F.2d 84 (5th Cir. 1980).

■ When we examine Cunningham's decision and the actions of Allen and Taylor in effectuating the arrest in light of the above considerations and circumstances of this case, we are convinced that probable cause did exist for the arrest of Tinkle and Garrett. Cunningham knew of the exten-

sive state and federal investigations into arson for hire activities in the Houston area. He knew that Kalfas had provided the authorities with relevant and material information, that he was an important prosecution witness in the scheduled trial of Conti, and that he was expected to testify in other criminal prosecutions flowing from the investigation. Cunningham knew Conti's record of prior brushes with the law. Conti was the first person to tip Cunningham about the threat against Kalfas' life. Based on his knowledge of the situation, Cunningham took Conti's tip as an attempt to establish cover, i. e., if harm befell Kalfas, Conti could remind of his earlier warnings. Cunningham never informed Conti that he was taking the threat seriously enough to place Kalfas under a watchful eye. About a month after Conti tipped Cunningham, the agents first observed persons, including Conti, maintaining a surveillance of Kalfas. Surveillance of Kalfas by various persons, including an employee of Conti known to be a prostitute, occurred at both Kalfas' home and place of business.

Cunningham testified that the agents received information about the threat to Kalfas from Sarvaunt who had no prior criminal record but was indicted with Conti for arson involving a business they jointly owned. Sarvaunt later joined Kalfas in testifying against Conti, and when he tipped the agents about Kalfas, Sarvaunt was attempting to effectuate a more favorable plea position with the government. This added credibility to Sarvaunt's representations.

Cunningham spoke of running license tag checks on five or six vehicles whose occupants were watching Kalfas and learning about half were stolen vehicles. The totality of the information Cunningham collated was sufficient to justify the continuous surveillance of Kalfas. It may not be reasonably assumed or inferred that this massive protective detail, involving 15 agents working around-the-clock, was done without an adequate factual base. It would also be unreasonable for us to conclude that Cunningham, an experienced and obviously very able officer, acted with insufficient justification when he ordered Northcutt to ram the Dodge if it attempted to pull abreast of Kalfas on the way to the subdivision. The order to ram by an experienced officer indicates the gravity of the situation as he perceived it.

We are mindful that subjective good faith on the part of the arresting officer is not enough to constitute probable cause. *Beck v. Ohio, supra.* But we have more than that before us. We have the actions of Cunningham apart from the arrest order, particularly his continuous protection orders and his order to ram the Dodge if necessary. We also have Cunningham's actions in the subdivision when he first assured that Kalfas was safe before joining the other agents for the arrest.

We are impressed with Cunningham's alert police work. He pulled together the known facts, drew reasonable inferences which proved to be accurate, measured intangibles meaningful only to one experienced and tuned to the field problem he faced, and decided that an imminent "hit" of Kalfas was more probable than not. He then acted on his decision. We are persuaded that Cunningham, as a reasonable, prudent, and cautious officer, guided by his expertise and training, had probable cause to order the arrest when it became clear to him that the occupants of the Dodge were following Kalfas and did not intend to allow him to escape. We agree with the observation of our colleagues of the Ninth Circuit that we must view this matter through Cunningham's eyes and from his trained perspective.

"Conduct innocent in the eyes of the untrained may carry entirely different 'messages' to the experienced or trained observer." *Davis v. United States,* 133 U.S. App.D.C. 172, 174, 409 F.2d 458, 460 (D.C. Cir. 1969), *cert. den.* 395 U.S. 949, 89 S.Ct. 2031; 23 L.Ed.2d 469 (1969). "The test is whether ordinarily, reasonable men, possessed of the experience and knowledge of [the arresting officers] would conclude that the transaction ... was more likely than not a criminal transaction." *United*

States v. Wabnik, 444 F.2d 203, 205 (2 Cir. 1971), cert. den. 404 U.S. 851, 92 S.Ct. 88, 30 L.Ed.2d 91 (1971).

United States v. Bernard, 607 F.2d 1257, 1266–67 (9th Cir. 1979).

■ In our overall evaluation of probable cause we must appropriately add any information that surfaced after the arrest decision and before the arrest. There are factors worthy of consideration. We have Taylor's testimony about the actions of the occupants of the Dodge as it entered and then drove through the intersection, stopping at the subdivision's entry intersection and obviously looking for Kalfas whom they had followed for 18 miles, at high speeds in heavy traffic. After losing sight of Kalfas, they drove through the subdivision at a very slow rate, peering into each driveway and carport. The extreme reaction of the driver when he observed Allen's use of his radio microphone and the rapid movement in reverse to get away from Allen, almost striking Taylor's vehicle as it blocked passage, and Tinkle's throwing his hands up as he brought the Dodge to a halt, only inches away from Taylor's vehicle, all add to the totality of the facts and circumstances which must be weighed in determining whether probable cause existed. We conclude that it did.

■ There is one remaining point for us to consider. At trial, much was made of the fact that Cunningham issued arrest orders while the vehicles were in transit on the interstate driving north out of Houston. While it is true that we must examine the situation as it existed at that time, the validity of an arrest does not necessarily turn on the knowledge of the arresting officer at the moment the decision to arrest is made. The critical time is the moment of arrest, not the moment the officer makes the decision to arrest. Two hypothetical situations focus this distinction. Imagine an officer who comes into possession of sufficient circumstantial evidence to convince even the most cautious officer that John Doe has committed an offense. He starts out to arrest Doe. While searching for Doe the officer is told by his superior

that another person has confessed to the crime and that Doe has been provided with an unqualified alibi. Consider the reverse situation. An overzealous watch commander directs an arrest of John Doe based solely on suspicion. While the arresting officer is searching for Doe, another defendant implicates him. Armed with this information eyewitnesses are quizzed who make positive photo identification of Doe. This information is relayed to the arresting officer just before he locates Doe. In each situation, in determining probable cause, the factual situation which must control is that which exists at the moment of arrest. Consequently, we find no substance to the contention that an arrest is invalid if it is not supported by probable cause at the time the decision to arrest is made.

### Investigatory Stop

Having found probable cause for the arrest of Tinkle and Garrett we need not examine in full the applicability of the stop permitted by the holding in Terry v. Ohio. We note merely that if probable cause was found wanting, the actions of agents Taylor and Allen were not excessive and are sanctioned by Terry v. Ohio. The agents knew that: (1) Kalfas had been under protective watch and that threats against his life had reportedly been made, (2) their superior was of the opinion an attempt on Kalfas' life was imminent, (3) the occupants of the Dodge had been following Kalfas across two counties at high rates of speed, (4) the Dodge had followed Kalfas into a remote subdivision and were apparently looking for him after losing sight of his auto, and (5) the driver of the Dodge reacted vigorously and attempted to drive in reverse at a fast rate, apparently upon observing a radio transmission by agent Allen. We are persuaded that it would have been unwise, imprudent and unreasonable for agents Taylor and Allen to approach the Dodge without the precaution of drawing their weapons and identifying themselves. This is confirmed by the fact that when they approached the car they observed a shotgun near Garrett's right hand and then found a

pistol near Tinkle's feet. Viewing the circumstances as they unfolded to the agents, and considering the information they possessed, we conclude that the arrests were not constitutionally infirm.

The decision of the district court suppressing the shotgun, pistol, ammunition, oral statement by Tinkle at the arrest scene and written statements of Tinkle given several hours after his arrest is REVERSED and the matter is REMANDED for further proceedings not inconsistent herewith.