**UNITED STATES of America, Plaintiff-Appellee,**

v.

**Jerry Lee HEAD, Defendant-Appellant.**

**No. 82–2004.**

United States Court of Appeals, Fifth Circuit.

Nov. 22, 1982.

---

mented aliens in violation of 8 U.S.C. § 1324(a)(2), after a bench trial, poses the sole question whether the stop and search of his tractor-trailer was contrary to the fourth amendment.[1] Concluding that the stop was lawful and that the search of the trailer was accomplished under circumstances which satisfy the probable cause and exigent circumstances requirements necessary for a warrantless search, we affirm.

## Background Facts

On the night of August 6, 1981, Harold Witt, a Customs Patrol Officer with eight years' experience, was directed to institute surveillance in the San Ignacio, Texas area because of recent reports of alien smuggling there. San Ignacio is approximately 30 miles south of Laredo and is within a few miles of the Rio Grande River. Not long after midnight, Witt parked his vehicle on a scenic overlook a short distance from San Ignacio. This overlook, situated in a park on the banks of the Rio Grande, is a popular rest and recreation spot but is also known as a prime locale for the smuggling of persons and contraband.

From his surveillance point on the overlook, Witt saw what appeared to be flashlight or lantern signals coming from the Mexican side of the river. Around 2:00 a.m., he saw a small boat ferrying four or five persons across the river. The boat made several trips, each time depositing its passengers on the riverbank near the overlook.

After observing the illegal entries, Witt drove north on a highway running parallel to the river to a point where the terrain permitted him to make radio contact with the Customs Patrol office in Houston. Witt asked his office to alert the Hebronville office of the Border Patrol about the entry of a large group of aliens at the San Ignacio overlook. Witt knew that on the previous day the Border Patrol had apprehended a band of aliens and was particularly inter-

Eustorgio Perez, Laredo, Tex., for defendant-appellant.

John M. Potter, Asst. U.S. Atty., Houston, Tex., for plaintiff-appellee.

Before INGRAHAM, REAVLEY and POLITZ, Circuit Judges.

POLITZ, Circuit Judge:

This appeal by Jerry Lee Head, convicted of the unlawful transportation of undocu-

---

1. Head moved to suppress the evidence uncovered during the search of the tractor-trailer. Following the trial court's denial of this motion, the case was tried by stipulation.

ested in the area. Houston promptly advised Witt that his information had been conveyed to the Hebronville office and that officers were being dispatched to San Ignacio.

Returning to the outskirts of San Ignacio, Witt observed a tractor-trailer unit, with headlights and clearance lights on, parked at a picnic area about three miles from the scenic overlook and 150 yards from the river. The trailer was red with a distinctive white and yellow stripe. Head, the driver, was standing by the tailgate, ostensibly repairing his clearance lights. Consistent with routine agency practice, Witt identified himself and offered assistance. Head said he was having problems with his lights and was uncertain whether he should continue on to McAllen or return to Laredo. In response to Witt's inquiry, Head said his trailer was empty and invited Witt to look inside. Witt opened the unlocked door and found the trailer empty except for an ice chest, two tires and some cardboard.

Witt departed, drove north a short distance, and then doubled back. As he drove past the picnic area, Witt observed Head standing motionless next to the cab. Witt instituted surveillance just south of Head's location and maintained a watch of the tractor-trailer for 20 minutes. During this interval he established radio contact with his fellow officers, customs agents Rivera and Lawrence, informing them of his suspicions that the tractor-trailer might be used to pick up the aliens earlier seen, and requesting their assistance. Both responded to his call.

After calling for assistance, Witt saw a second vehicle park behind the trailer. All lights were immediately doused. A few minutes later the tractor-trailer was driven to the scenic overlook. Witt followed, renewed surveillance, and radioed Rivera and Lawrence of the truck's change of position. He instructed Rivera to check the overlook for further activity and in a subsequent transmission described Head's vehicle.

Following Witt's orders, Rivera, also an experienced customs patrol officer, drove to the overlook. Rivera was aware of the area's popularity with smugglers. He noted an empty Ford pickup but saw no sign of Head's truck. He then returned to the highway and continued patrolling. Not far from the overlook, in a heavily brushed area on the south side of a bridge traversing the San Francisco Creek, Rivera spotted the truck Witt had described. A man was standing next to the vehicle. After notifying Witt of his observations, Rivera proceeded to San Ignacio to meet with border patrol agents. Witt instructed Lawrence to monitor the movements of the truck.

Rivera met border patrol officers Alaniz and Torres at a San Ignacio gas station and relayed to them what he knew about Head and his truck. While they were conferring, the officers heard a radio transmission in which Lawrence informed Witt that the truck was now in motion traveling south. At Rivera's suggestion the officers intercepted the truck as it reached San Ignacio.

Head exited the truck; the officers identified themselves; Head produced his driver's license. In response to questioning, Head stated that he was heading to Zapata to have his lights repaired; he said that he carried no cargo. The trailer was locked. The officers requested a key; Head denied having one. Rivera told him that if he didn't produce a key they would have to break the lock.

At this point the record reflects Witt's arrival on the scene. Evidently aware of Witt's presence, Head took the key from his pocket and handed it to an officer. Thirty undocumented aliens were found inside the trailer.[2]

### The Stop

■ We need comment only briefly on the issue of the investigatory stop of the truck. To justify the interception, agents Rivera, Alaniz and Torres must have been "aware of specific articulable facts, together with rational inferences from these facts that reasonably warrant[ed] suspicion" that Head was engaged in illegal activity. *Unit-*

---

2. It is not contended that Head consented to the search; he obviously did not.

ed States v. Brignoni-Ponce, 422 U.S. 873, 884, 95 S.Ct. 2574, 2581, 45 L.Ed.2d 607 (1975). *See United States v. Cortez,* 449 U.S. 411, 101 S.Ct. 690, 66 L.Ed.2d 621 (1981). Although this standard is less stringent than probable cause, it too is objective, *Terry v. Ohio,* 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968), and requires the formulation of a reasonable and articulable suspicion. *Reid v. Georgia,* 448 U.S. 438, 100 S.Ct. 2752, 65 L.Ed.2d 890 (1980) (per curiam). *See United States v. Kreimes,* 649 F.2d 1185 (5th Cir.1981). Reasonable suspicion may be predicated upon the collective knowledge of law enforcement officers where there has been reliable communication between them. *See United States v. Kreimes; United States v. Allison,* 616 F.2d 779 (5th Cir.), *cert. denied,* 449 U.S. 857, 101 S.Ct. 156, 66 L.Ed.2d 72 (1980); *United States v. Butler,* 611 F.2d 1066 (5th Cir. 1979), *cert. denied,* 449 U.S. 830, 101 S.Ct. 97, 66 L.Ed.2d 35 (1980).

■ We conclude that the agents had a reasonable suspicion, founded upon articulable objective facts, that criminal activity was afoot, thus warranting the brief investigatory stop in question. Shortly before the stop, agents Alaniz and Torres had received a radio transmission from their Hebronville office advising that customs personnel had seen aliens fording the Rio Grande in small boats near San Ignacio. Alaniz knew that 13 aliens had been apprehended there the day before. Rivera knew, from his communications with Witt, that the suspect tractor-trailer had progressed a mere three miles within a time-span of approximately one hour, traveling from one point in close proximity to the Rio Grande to another equidistant. Witt told Rivera and Lawrence that he considered the driver's behavior suspicious. From his own observations, Rivera knew that Head had moved to the San Francisco bridge, only 500 yards from an empty Ford pickup parked on the scenic overlook where defendant had last been spotted, and was seen standing motionless beside the truck. This particular locale was surrounded by dense undergrowth which, in Rivera's experience, provided an ideal place of concealment for aliens awaiting transportation. The officers had an abundance of reasonable suspicion of illegal activities.

### The Search

■ The constitutional validity of the search turns upon the existence of probable cause and exigent circumstances.[3] Here the mobility of the vehicle, coupled with its proximity to the border and potential for flight and for the secreting of evidence, supply the necessary exigent circumstances. *See Arkansas v. Sanders,* 442 U.S. 753, 99 S.Ct. 2586, 61 L.Ed.2d 235 (1979); *United States v. Petty,* 601 F.2d 883 (5th Cir.1979), *cert. denied,* 445 U.S. 962, 100 S.Ct. 1649, 64 L.Ed.2d 237 (1980). However, the former element demands a closer examination.

■ As we have stated, "probable cause exists whenever the facts and circumstances known to the officer, and of which he has reasonably trustworthy information, are sufficient to warrant a person of reasonable caution to believe that an offense has been or is being committed. The currency of probable cause is probability, not legal certainty . . . ." *United States v. Tinkle,* 655 F.2d 617, 621 (5th Cir.1981), *cert. denied,* 455 U.S. 924, 102 S.Ct. 1285, 71 L.Ed.2d 467 (1982). In determining whether probable cause exists, we must examine the totality of the circumstances and the inferences that can reasonably be drawn therefrom, *United States v. Clark,* 559 F.2d 420 (5th Cir.), *cert. denied,* 434 U.S. 969, 98 S.Ct. 516, 54 L.Ed.2d 457 (1977), mindful that we are dealing with "factual and practical considerations of everyday life on which reasonable and prudent men, not legal technicians, act." *Brinegar v. United States,* 338 U.S. 160, 175, 69 S.Ct. 1302,

---

3. There is no contention on the part of the government that the less exacting standards applicable to border searches or roving patrol stops appertain herein, nor would the record support such a contention. Accordingly, our analysis centers upon whether probable cause and exigent circumstances justified the warrantless search. *United States v. Sanchez,* 689 F.2d 508 (5th Cir.1982). *See United States v. Ballard,* 600 F.2d 1115 (5th Cir.1979).

1310, 93 L.Ed. 1879 (1949); *United States v. Tinkle.* We do not view the facts available to the officers in a vacuum, but recognize that the officers are entitled to rely on their specialized training and knowledge when assessing the factual situation encountered. *See United States v. Tinkle; United States v. Clark.*

Where officers are working in concert, probable cause may arise from the " 'total of layers of information and the synthesis of what the . . . [officers] have heard, what they know, and what they observed,' considered in light of the degree of communication between the individual officers and their individual experience." *United States v. Wright,* 588 F.2d 189, 193 (5th Cir.1979) (*quoting from United States v. Edwards,* 577 F.2d 883, 895 (5th Cir.), *cert. denied,* 439 U.S. 968, 99 S.Ct. 458, 58 L.Ed.2d 427 (1978)). *See United States v. Sanchez,* 689 F.2d 508 (5th Cir.1982); *United States v. Clark.* When the evidence is construed in this manner, " 'it may truly be said that the total may be a sum greater than its parts.' " *United States v. Edwards,* 577 F.2d at 895 (*quoting from United States v. Clark,* 559 F.2d at 424).

■ If our inquiry were confined to the knowledge of detaining agents Rivera, Alaniz and Torres, as outlined in the preceding paragraphs, we would find that knowledge inadequate to warrant a prudent officer in believing that the defendant was committing an offense. Witt did not advise Rivera of the rendezvous between Head and the driver of the Ford pickup, nor did he indicate that the truck had been unlocked when earlier checked and that the trailer contained an ice chest, suggesting the possibility of human cargo. Rivera had not heard Witt's radio communication regarding the 2:00 a.m. alien crossing, although Alaniz expressed awareness of this information. Thus examined, on this record, the facts and reasonable inferences within the cognizance of Rivera, Alaniz and Torres[4] at the time of the stop fostered a reasonable suspicion of wrongdoing, but fell short of the factual basis required for a finding of probable cause.[5]

■ Our determination of probable cause is not circumscribed, however, by the knowledge of the three detaining officers at the moment the decision to search was made. "The critical time is the moment of arrest." *United States v. Tinkle,* 655 F.2d at 623. Likewise, the critical time here is the moment the search was made. *See United States v. Sanchez; United States v. Ballard; United States v. Wright.* Hence additional factors which develop after a legal stop may precipitate the ripening of reasonable suspicion into probable cause. Subsequent to the stop but before the commencement of the search, Head denied possession of a key to the locked trailer. While in some circumstances such a disclaimer may permit an inference that contraband is concealed behind the lock, we do not perceive this case as justifying that inference.[6]

Our analysis is keyed to the impact upon the probable cause equation of Witt's appearance just before the execution of the

---

4. The record lends little to a determination of the knowledge possessed by Torres; he did not testify.

5. There was no evidence that Rivera, Alaniz and Torres acted at the order of Witt or any member of the supervisory chain of command of either the customs or border patrol agencies when they stopped and searched Head's vehicle. *Cf. Whitely v. Warden,* 401 U.S. 560, 91 S.Ct. 1031, 28 L.Ed.2d 306 (1971). Therefore, the detaining officers may not rely upon orders or directives which were premised on probable cause. We look only to the composite knowledge of the officers present at the search.

6. *Compare United States v. Petty* (where inflated spare tire and other items ordinarily stored in trunk were on car's back seat in plain view, thereby arousing suspicion that something was hidden in trunk, defendant's statement he had no key to trunk because he borrowed car from spouse further buttressed inference of concealment); *United States v. Medina,* 543 F.2d 553 (5th Cir.1976) (per curiam), *cert. denied,* 429 U.S. 1109, 97 S.Ct. 1144, 51 L.Ed.2d 563 (1977) (border patrolman had probable cause to search defendant's vehicle at border checkpoint after vehicle ran checkpoint, officer detected odor of air freshener emanating from vehicle's interior and defendant denied having a key to the trunk). *See also United States v. Patacchia,* 602 F.2d 218 (9th Cir.1979).

search. Witt knew about the alien crossing, the open trailer containing the ice chest, the recent apprehension of aliens in the area and the defendant's circuitous movements and rendezvous with the pickup truck. This information, when collated in the crucible of Witt's training and years of experience, permitted a reasonable inference that the product of the smuggling was contained in the now-locked trailer. Witt's timely arrival, as reflected by the record before us, thus completes the mosaic of probable cause.

Because of Witt's fortuitous arrival, we need not resolve the difficult question of whether the details Witt actually transmitted to Rivera by radio constitute that minimum quantum of reliable information necessary to the application of the collective knowledge doctrine.

The motion to suppress was properly denied. The convictions are AFFIRMED.