**UNITED STATES of America,
Plaintiff-Appellee,**

v.

**Arnaldo MELENDEZ–GONZALEZ, a/k/a
Lebrado Mendoza-Martinez,
Defendant-Appellant.**

**No. 83–1378.**

United States Court of Appeals,
Fifth Circuit.

March 7, 1984.

Robert Ramos, Federal Public Defender, R. Clark Adams, Asst. Federal Public Defender, El Paso, Tex., for defendant-appellant.

Sidney Powell, Asst. U.S. Atty., San Antonio, Tex., for plaintiff-appellee.

Before BROWN, REAVLEY, and WILLIAMS, Circuit Judges.

JERRE S. WILLIAMS, Circuit Judge:

This appeal is by Arnaldo Melendez-Gonzalez, convicted after a bench trial of possession with intent to distribute marihuana in violation of 21 U.S.C. § 841(a)(1). It poses the sole question whether the stop and search of his automobile violated the Fourth Amendment. After carefully reviewing the circumstances surrounding the stop, we conclude that the roving border patrol agents lacked sufficient cause to justify the warrantless stop. Since the stop was illegal, the court erred in failing to grant defendant's motion to suppress the contraband obtained as a result of the search. *Wong Sun v. United States,* 371 U.S. 471, 83 S.Ct. 407, 9 L.Ed.2d 441 (1963). We also find that the search itself was illegally conducted since the agents did not have probable cause to search the automobile.

## FACTS

On February 6, 1983, Border Patrol Agent Horger and his partner, Agent Hamilton, were stationed in Marfa, Texas. They were working the midnight to eight shift on Highway 67 between Marfa and Presidio, a town on the Texas-Mexico border. Highway 67 extends from Presidio, through Shafter to Marfa. The agents were sitting in a patrol car, stationed in an office parking lot on the east side of Highway 67 on the outskirts of Marfa. Marfa is a town of 2500 residents, located sixty miles north of the border.

At approximately 4:57 a.m., the agents were alerted by activation signals on their radio indicating that traffic was crossing a sensor located on the highway approximately 25 miles south of Marfa. Two minutes after the first activation, the agents observed a second hit on the sensor. Twenty or twenty-five minutes later, the agents observed two vehicles enter Marfa, driving only 50 yards apart. The first vehicle was a white pickup truck occupied by one person; the second vehicle was a silver automobile occupied by two persons. The automobile appeared to the agents to be "heavily loaded". The pickup truck stopped in the parking lot of a convenience store, but the silver automobile proceeded on to the intersection of Highway 67 and Highway 90. At this point, the agents switched on their red emergency lights and pursued the automobile without investigating the pickup.[1]

Agent Horger stopped the automobile, identified himself as a Border Patrol Agent, and asked the driver for identification. The driver produced a driver's license in the name of Labrado Mendoza and claimed that he was that person. The agents later discovered that the driver's real name was Arnaldo Melendez. Hereinafter, we will refer to the driver as Melendez and not Men-

---

1. Agent Horger testified that although he wanted to investigate the pickup truck as well, it was impractical to do so since both agents were in one vehicle. In addition, Horger's partner was in trainee status at the time and it would violate policy for Horger to allow the trainee to proceed on his own.

doza. Melendez also claimed United States citizenship and that he was coming from Presidio. The passenger, however, was more evasive. When questioned about his citizenship, the passenger claimed that he didn't speak English but that he had been living in Lovington, New Mexico, for the last ten years. When Agent Horger persisted in questioning the passenger about his nationality, he finally stated that he was born in Colorado City, Texas, but he could not offer proof of United States citizenship. At this point, Agent Horger suspected that the passenger was an illegal alien. Based on this suspicion, as well as on their earlier observations, the agents decided to investigate the trunk of the car more carefully.[2]

Upon examination, the agents noticed a small hole in the trunk, a little smaller than a dime, which apparently had been used to mount a CB radio antenna at one time. With the aid of a flashlight, the agents peered into the hole and detected a burlap covered object inside. The agents then asked Melendez to open the trunk, but he refused, stating that he did not have a key. At this point, without requesting consent, Agent Horger and his partner partially sprung the lid of the trunk with a tire tool in order to get a better look at the contents. Once the trunk was sprung, the agents could see a large burlap sack inside and could smell the odor of marihuana.

The agents took Melendez and his passenger to the station and gave both men *Miranda* warnings. At that time, while he was in custody, Melendez agreed to allow the agents to search the car, and he signed a consent form to this effect. Melendez claimed that he did not own the car and that he was not familiar with its contents. The agents pried open the trunk and found twenty-one pounds of marihuana. DEA agents ultimately found the trunk key taped under the dash board of the car and learned that Melendez had purchased the automobile a few months earlier in Mexico.

Melendez waived his right to a trial by jury and was convicted by the court of

possession with intent to distribute marihuana in violation of 21 U.S.C. § 841(a)(1). Prior to trial, defendant moved to suppress all evidence obtained as a result of the stop and subsequent search of his car, alleging that the stop and search were illegal. The trial court denied the motion, finding that the initial stop was justified by the agents' reasonable suspicion that the car contained aliens illegally entering the country and that the subsequent search of the automobile was justified by probable cause. Alternatively, the court found that the defendant voluntarily signed a "consent to search" form and that such consent vitiated the earlier allegedly illegal stop and search. We reverse, finding that neither the stop nor the search were justified. Further, any consent signed by the defendant came too late to vitiate the illegality, since by the time the consent form was signed, the illegal stop and search had already been conducted.

### I. *The Stop*

Since this case involves the stop and search of an automobile by a roving border patrol, our decision is controlled by the principles announced by the Supreme Court in *United States v. Brignoni-Ponce,* 422 U.S. 873, 95 S.Ct. 2574, 45 L.Ed.2d 607 (1975). In *Brignoni-Ponce,* the Court held that:

> [e]xcept at the border and its functional equivalents, officers on roving patrol may stop vehicles only if they are aware of specific articulable facts, together with rational inferences from those facts, that reasonably warrant suspicion that the vehicles contain aliens who may be illegally in the country.

*Id.* at 884, 95 S.Ct. at 2582; *see also United States v. Cortez,* 449 U.S. 411, 101 S.Ct. 690, 66 L.Ed.2d 621 (1981).

Several objective factors may be taken into account by the border patrol agent in determining whether a stop would be justified by "reasonable suspicion." These factors include: (1) characteristics of

---

**2.** Agent Horger testified that while based on his experience he did not think it was common to attempt to smuggle aliens in trunks, he had found an alien in a trunk on one occasion.

the area in which the vehicle is encountered; (2) proximity to the border; (3) usual patterns of traffic on the road; (4) previous experience with alien traffic; (5) information about recent illegal crossings in the area; (6) behavior of the driver; (7) appearance of the vehicle; and (8) number, appearance and behavior of the passengers. *United States v. Brignoni-Ponce, supra,* 422 U.S. at 885, 95 S.Ct. at 2582. Reasonable suspicion is not limited to any or all of these factors. Instead, "[e]ach case must turn on the totality of the particular circumstances," and "the officer is entitled to assess the facts in light of his experience in detecting illegal entry and smuggling." *Ibid.*

▮ When someone has "definitely and positively entered this country from abroad" a stop is automatically justified. *United States v. Lopez,* 564 F.2d 710, 712 (5th Cir.1977). Thus, agents need not show probable cause or even reasonable suspicion in order to justify a stop and search at the border or its functional equivalent. *See Almeida-Sanchez v. United States,* 413 U.S. 266, 272–73, 93 S.Ct. 2535, 2539, 37 L.Ed.2d 596 (1973). When a person is traveling within our country, however, we are more hesitant to allow interference, even if the vehicle is close to the border. For this reason, this Court has repeatedly emphasized that one of the vital elements in the *Brignoni-Ponce* reasonable suspicion test is whether the agents had reason to believe that the vehicle in question recently crossed the border. *See, e.g., United States v. Pena-Cantu,* 639 F.2d 1228, 1229 (5th Cir. 1981); *United States v. Pacheco,* 617 F.2d 84, 86 (5th Cir.1980); *United States v. Lamas,* 608 F.2d 547, 549 (5th Cir.1979). When the stop occurs a substantial distance from the border, we have found this element missing. *United States v. Lamas, supra* at 549; (190 miles from border); *United States v. Escamilla,* 560 F.2d 1229, 1232 (5th Cir.1977) (70 miles from border).

▮ In the present case, the border patrol stopped appellant's automobile some sixty miles from the Mexican border. While Highway 67 extends from the border, it goes through Presidio, Texas, a town with a population of 1100–1200, and Shafter, with a population of 700–800, before reaching Marfa. It was possible, of course, that appellant had begun his trip south of the border. But it was also possible that appellant had begun his trip north of the border in Presidio or in Shafter. Agent Horger had no independent reason to believe that the former was more likely than the latter. If a vehicle is already past towns in this country, the mere fact that it is proceeding on a public highway leading from the border is not sufficient cause to believe the vehicle came from the border.

▮ Even if the agents did not have sufficient information reasonably to suspect that defendant came from the border, however, *Brignoni-Ponce* may still be satisfied if other articulable facts warrant reasonable suspicion. *United States v. Escamilla, supra* at 1232. In this respect, the Government contends that the fact that defendant's automobile was traveling in tandem with a truck in a "lead car-load car" pattern coupled with the claimed low-riding of the car reasonably aroused the agents' suspicions that aliens were being transported. The Government also emphasizes that in Agent Horger's experienced opinion, Highway 67 is a known smuggling route, particularly in the early morning hours.

We are reluctant to consider these factors since in making their decision to stop the car, it is questionable that the agents actually relied on anything more than the fact that defendant was traveling north on Highway 67. At the suppression hearing, Agent Horger testified several times that he was stopping vehicles solely because they crossed over the sensor.[3] In fact, Agent Horger and his partner undertook to stop and check *every* vehicle that crossed over

---

**3.** We have held that stopping a car simply because it crosses a sensor in the highway falls below the standard of reasonable suspicion.

*United States v. Frisbie,* 550 F.2d 335, 338 (5th Cir.1977); *United States v. Shields,* 534 F.2d 605 (5th Cir.1976).

the sensor that night.[4] With respect to the stop in the present case, Agent Horger specifically testified that "we had already—in fact when the sensor hit, you know, the two vehicles showed up, we decided to pull them over and check them out."

Our decision regarding the reasonableness of this particular stop, however, cannot be controlled by the fact that the agents fully intended to stop every car. "The legality of the officers' action depends upon *the objective facts known to them at the time the appellant's freedom was restricted by the stop,* and not upon the officers' subjective reasons for their actions." *United States v. Estrada,* 526 F.2d 357, 358 (5th Cir.1976) (emphasis added); *see also United States v. Head,* 693 F.2d 353, 358 (5th Cir. 1982).

In any event, even if relevant, the fact that defendant's car was supposedly "riding low"[5] has not been given determinative weight in border patrol cases. *United States v. Orona-Sanchez,* 648 F.2d 1039, 1042 (5th Cir.1981); *United States v. Pacheco, id.* at 86 (5th Cir.1980); *United States v. Lamas, supra* at 549.

Neither have we afforded great weight to the fact that two cars are traveling in what appears to be a "lead car-load car" configuration. We recognize that to an experienced border agent, this traffic pattern may "understandably raise ... suspicions," but "observation of two cars in proximity on a sparsely traveled road does not in itself justify a stop." *United States v. Barnard,* 553 F.2d 389, 392 (5th Cir.1977). The agents had observed five vehicles other than defendant's on the road in the early morning of that day, one within the previous hour. Further, there was no other evidence to bolster the lead car-load car inference, as we have required in the past. In *Barnard,* for example, we gave weight to the fact that two automobiles were traveling in tandem, but noted additional connecting factors such as the observation of

CB radios and the two vehicles having similar license plates as significantly influencing our decision. We specifically stated that "[a]bsent [such] connecting factors ... the proximity of the automobiles might seem ambiguous...." *Id.* at 392 n. 6; *see also United States v. Escamilla, supra,* at 1234.

Finally, we note the absence in this case of certain factors which have been considered persuasive in the past in judging the validity of a stop by a roving patrol. For example, this case presents no evidence of erratic driving, *United States v. Walker,* 522 F.2d 194 (5th Cir.1975) (three vehicles traveling at high rate of speed failed to stop at intersection and subsequently led agents on chase at speeds in excess of 85 miles per hour); no suspicious behavior by the occupants, *United States v. Estrada, Id.* at 357 (5th Cir.1976) (after border agents stopped first vehicle, second vehicle came to a stop at trash barrel three blocks from intersection and only resumed motion when approached by agents); no tip by informants, *United States v. Nunn,* 525 F.2d 958 (5th Cir.1976); and no features on the defendant's vehicle that would make it a likely mode of transportation for illegal aliens, *United States v. Lara,* 517 F.2d 209 (5th Cir.1975) (pick-up truck with camper shell); *United States v. Payne,* 555 F.2d 475 (5th Cir.1977) (camper with blackened out rear windows equipped with air shock absorbers). The absence of these factors as well as the unpersuasive nature of the factors that were offered by the Government leads us to conclude that the stop in this case was illegal.

## II. *Search of the Automobile*

Since we find that the stop of defendant's vehicle was unlawful, the ensuing search necessarily falls as well. Assuming arguendo the legality of the initial stop, however, we would still be compelled to reverse this case, since we find that the search itself was illegal.

---

**4.** Prior to the activation in question, the agents had responded to similar signals at 12:24 a.m., 2:38 a.m., 3:33 a.m., and 4:21 a.m.

**5.** Appellant's vehicle trunk contained a tire tool, a jack and a spare tire in addition to the twenty-one pounds of marihuana. Hardly enough to cause the vehicle to "ride low".

In the case of a legal stop, the detaining agent is permitted to "question the driver and passengers about their citizenship and immigration status, and he may ask them to explain suspicious circumstances, *but any further detention or search must be based on consent or probable cause.*" *Brignoni-Ponce, supra,* 422 U.S. at 881–82, 95 S.Ct. at 2580 (emphasis added).

We have held that probable cause to search an automobile exists when "trustworthy facts and circumstances within the officer's personal knowledge would cause a reasonably prudent man to believe that the vehicle contained contraband." *United States v. Edwards,* 577 F.2d 883, 895 (5th Cir.) (en banc), *cert. denied,* 439 U.S. 968, 99 S.Ct. 458, 58 L.Ed.2d 427 (1978). When determining whether probable cause exists, we consider the "sum total of layers of information and the synthesis of what the police have heard, what they know, and what they observe as trained officers." *Smith v. United States,* 358 F.2d 833, 837 (D.C.Cir.1966), *cert. denied,* 386 U.S. 1008, 87 S.Ct. 1350, 18 L.Ed.2d 448 (1967).

In the present case, the Government argues that probable cause was established by all the factors which led to the initial stop, as well as the fact that the passenger could not prove United States citizenship. In addition, the Government relies on the presence of the small hole in the surface of the trunk which they contend could be used to facilitate breathing of individuals concealed in the trunk. Finally, the Government points to Agent Horger's general experience with smuggling [6] as well as his specific experience on one occasion where a trunk was employed as a means of smuggling aliens.

We do not find the Government's arguments persuasive. The mere fact that the only passenger in the automobile could not prove his citizenship would not lead a reasonable person to conclude that there were probably other passengers in the trunk with similar problems. As for the dime sized hole in the trunk, Agent Horger himself testified that the hole had probably been drilled originally to support a CB radio antenna. We do not think that under these circumstances a prudent person could conclude that the tiny hole doubled as a breathing device for aliens smuggled in the trunk. Even considering Agent Horger's experience with smugglers, we cannot conclude that the facts in this case present probable cause that aliens or any other forms of contraband were hidden in the trunk. The agents were not justified in prying up one side of the trunk, an action taken without consent of Melendez, which enabled them to smell the marihuana.

### III. Consent Search

In the alternative, the Government argues that even if the initial stop was not justified, and even if there was no probable cause to search, whatever searches that occurred were consensual. In support of this argument, the Government points to two separate incidents in which they claim that the defendant gave the agents consent to search the automobile. First, the Government contends that the defendant consented to a search of the trunk of the car at the scene of the arrest by disclaiming any ownership interest in the automobile or its contents. Second, the Government notes that at the station, defendant signed a consent form after being given *Miranda* warnings and after being advised of his right to refuse to sign the consent form. The district court accepted the latter argument. In its order denying defendant's motion to suppress, the court held that "[a]lternatively, . . . the consent to search signed by Defendant was voluntarily given, and that such consent vitiates the allegedly illegal stop."

We find the district court's conclusion with regard to consent incorrect as a matter of law. We do not dispute the fact that defendant actually signed the consent form, or even that he did so voluntarily. Further, we accept the well-established rule that "a search conducted pursuant to consent is excepted from requirements of probable cause and warrant." *United States v. Baldwin,*

---

**6.** Agent Horger had worked with the United States Border Patrol for six years.

644 F.2d 381, 383 (5th Cir.1981). There is no authority, however, which justifies an earlier illegal search based upon a later consent to an additional search.

 A search is conducted when the state makes an invasion into a place in which one has reasonable expectation of privacy. *Katz v. United States,* 389 U.S. 347, 361, 88 S.Ct. 507, 516, 19 L.Ed.2d 576 (1967). (Harlan concurring). In the present case, defendant's reasonable expectation of privacy was violated on the highway when the agents sprung the trunk and first smelled marihuana. The fact that the agents did not continue their exploration at this point does not make their actions any less a "search." Since for all practical purposes, the search was conducted on the highway, the consent form which defendant signed at the station simply came too late.

[11] We also reject the Government's contention that defendant consented to the search while he was still on the highway. In making this argument, the Government relies on the district court's finding that the defendant disavowed any personal interest in the trunk's contents at that time. In its order denying defendant's motion to suppress, the court described the highway scene in its findings as follows:

> The agent shined his flashlight into the hole and saw burlap. When asked to open the trunk, *the Defendant said he had no objection,* but that it was not his car and he did not have the keys at that time. The agent then unsuccessfully attempted to pry open the trunk, and in so doing, smelled the pungent odor of marijuana. (Emphasis added).

At the suppression hearing, Agent Horger described the scene somewhat differently. Horger testified that:

> At this point I asked the driver, the defendant, if he would open the trunk to

the car *and he stated that he didn't have the key to the trunk. And I asked him where the key was, and he said he didn't know, it wasn't his car.* And so at this point we got a tire tool out of our car and lifted up the trunk a little bit..." (Emphasis added)

On cross-examination, Agent Horger gave more details about his conversation on the highway with defendant. Horger testified that although defendant stated that he was not the actual owner of the car, he also told Horger that he had borrowed the car from a friend and that he had been in possession of the car for a week.

Based on Agent Horger's testimony, we conclude that the district court's factual findings with respect to the defendant's statements at the scene of the search were clearly erroneous. The record is devoid of evidence indicating that the defendant "said he had no objection" to the search, as the district court found. Instead, the defendant expressed a possessory interest in the car [7] and merely indicated that he could not open the trunk because he did not have a key.

 When attempting to prove voluntary consent to search following an illegal stop, the Government has a much heavier burden to satisfy than when proving consent to search after a legitimate initial stop. *United States v. Ballard,* 573 F.2d 913, 916 (5th Cir.1978). In addition to proving valid and voluntary consent to search, the Government must also establish the existence of intervening factors which prove that the consent was sufficiently attenuated from the illegal stop. *Bretti v. Wainwright,* 439 F.2d 1042, 1045 (5th Cir.), *cert. denied,* 404 U.S. 943, 92 S.Ct. 293, 30 L.Ed.2d 257 (1971). Unlike the formal consent signed by defendant at the station, the

---

7. For fourth amendment purposes, defendant expressed a significant possessory interest in the automobile despite the fact that he denied ownership interest. *Compare Jones v. United States,* 362 U.S. 257, 80 S.Ct. 725, 4 L.Ed.2d 697 (1960) (sufficient possessory interest for Fourth Amendment purposes where petitioner did not own apartment, but had been given permission to use apartment by a friend and was sole occupant at time of search) with *Rakas v. Illinois,* 439 U.S. 128, 99 S.Ct. 421, 58 L.Ed.2d 387 (1978) (insufficient possessory interest where petitioners were simply passengers in automobile; owner of vehicle was driving at time of search).

vague conversation carried on between the defendant and the agents at the scene of the search does not satisfy this burden.

In summary, we find lack of sufficient cause to stop the vehicle which Melendez was driving and lack of cause and lack of consent to prying the trunk of the vehicle partially open. The conviction for possession of marihuana with intent to distribute must be reversed.

REVERSED.