IN THE UNITED STATES COURT OF APPEALS

FOR THE FIFTH CIRCUIT

_____

No. 99-40653
_____


UNITED STATES OF AMERICA

                    Plaintiff-Appellee

-vs-


IVAN VALENCIA,
also known as Antonio Ramirez Gonzalez

                    Defendant-Appellant

_____

Appeal from the United States District Court
Southern District of Texas
(Criminal Action No. B-98-CR-609)
_____

June 22, 2000

Before WIENER and STEWART, Circuit Judges, and LITTLE, District Judge.[*]

LITTLE, District Judge:[**]

      Appellant challenges the legitimacy of the investigative stop that led to his arrest for, and

subsequent plea of guilty to, the charge of illegally smuggling aliens into the United States. For the

_____

      [*] District Judge of the Western District of Louisiana, sitting by designation.

      [**] Pursuant to 5TH CIR. R. 47.5, the court has determined that this opinion should not be
published and is not precedent except under the limited circumstances set forth in 5TH CIR. R. 47.5.4.

following reasons, we affirm the district court's finding that the stop was supported by reasonable suspicion derived from articulable facts and their attendant rational inferences.

## FACTUAL AND PROCEDURAL BACKGROUND

On 26 October 1998, at approximately 10:15p.m., Border Patrol Agents Edward J. Kelly and Paul Backor were on roving patrol in a marked sedan, driving southbound on F.M. 2520. These agents were on a staggered shift of 4 p.m. to 12 a.m. as the Border Patrol had determined that smugglers of aliens were taking advantage of the confusion engendered by the standard shift change at 10 p.m. by performing the bulk of their activity at that time. Traffic was light on F.M. 2520 at that time of night. From a distance of about a quarter-mile, the agents noticed a van turn north on F.M. 2520 from Highway 281. The van appeared to be proceeding east on Highway 281 before turning on to F.M. 2520. At that junction, Highway 281 is a little less than a mile from the Rio Grande. This intersection was known by the Border Patrol and these particular agents to be especially rife with smuggling of illegal aliens, with transport vehicles picking up the aliens at abandoned houses nearby. At least twenty times within the preceding year, Agent Kelly had apprehended illegal aliens in the immediate area from which the van came. The agents slowed and pulled over to the shoulder, hoping to get a good look at the van as it passed by. The van approached slowly. Illuminated only by the low beam headlights of the Border Patrol sedan, the van appeared to be a passenger van of older vintage and riding very low in the rear. The agents then turned to follow the van, tracking it at a distance of about six car lengths. The headlights of the sedan were situated much lower than the windows of the passenger van, so the agents decided to rely on illumination provided by oncoming vehicles proceeding southbound. Over the course of three miles, a few cars passed and the

2

illumination provided thereby indicated that the van had only two people in it. The cause of the excessive weight could not be determined, but there appeared to be condensation on the windows. As the weather that evening was not conducive to causing condensation on the windows, the Agents concluded that the condensation would be an indication that there were many more than two people riding in the van. The agents then tried to get closer to the van so they could run a vehicle registration and stolen vehicle check. The van however had no license tags. The agents then passed the van and stopped at an intersection about a mile down the road. The agents had ten seconds to examine the van as it passed by. Unfortunately, there was no back lighting so they could not see through the side windows. They confirmed that the van was riding in an obviously overloaded condition, a condition confirmed by the fact that the back right wheel was obscured. The agents then pulled in behind of the van and shortly thereafter stopped the van. The condensation on the windows and the overloaded condition of the van could reasonably be caused by human cargo in excess of the two known occupants of the van.

The agents approached the van brandishing their flashlights. Agent Kelly shined his flashlight through a rear window and saw numerous bodies stacked on top of each other. The occupants were lying below the plane of the window. The driver of the van--the appellant--willingly surrendered the keys to the van and was arrested. The appellant made no effort to flee or otherwise evade the agents' commands. It was then determined that there were nineteen illegal aliens stacked like cord wood on top of each other in the van.

On 4 January 1999, the district court entertained a motion to suppress any evidence gained from the investigative stop. The district court denied the motion, finding the requisite reasonable

3

suspicion based on the following articulable facts:   (1) the proximity to the border; (2) the agent had personal knowledge of heavy alien traffic in the area; (3) the appearance of the vehicle, particularly the fact that it was over loaded; (4) there appeared to be only two occupants in the vehicle; (5) closer inspection by the agents did not dissuade them of their suspicion.  The appellant then entered a conditional plea of guilty.  Appellant was sentenced on 8 April 1999 to a term of imprisonment of eight months, three years supervised release, and 250 hours of community service.  Appellant filed a timely notice of appeal.

## STANDARD OF REVIEW

Appellant does not challenge Agent Kelly's recitation of the facts but rather maintains that those facts do not support an investigative stop.  We review the district court's legal conclusion *de novo*. *See United States v. Aldaco*, 168 F.3d 148, 149-50 (5th Cir. 1999).  The evidence is viewed in the light most favorable to the prevailing party; in this case, the government. *See United States v. Gonzalez*, 190 F.3d 668, 671 (5th Cir. 1999).

## DISCUSSION

Investigative stops by the border patrol must comply with the strictures imposed by the Fourth Amendment. *See United States v. Brignoni-Ponce*, 422 U.S. 873, 878  (1975) ("The Fourth Amendment applies to all seizures of the person, including seizures that involve only a brief detention short of traditional arrest."); *United States v. Nichols*, 142 F.3d 857, (5th Cir. 1998) ("We are, of course, bound by Supreme Court precedent on the matter, but our reassessment, in light of current events, of the competing interests at stake in the determination of reasonable suspicion bolsters the

4

continued vitality of the Supreme Court's mandate in *Brignoni- Ponce*."). "Border patrol 'officers on roving patrol may stop vehicles only if they are aware of specific articulable facts, together with rational inferences from those facts, that reasonably warrant suspicion that the vehicles contain aliens who may be illegally in the country.'" *United States v. Orozco*, 191 F.3d 578, 581 (5th Cir. 1999) (quoting *United States v. Brignoni-Ponce*, 422 U.S. 873, 884 (1975)). "In applying the *Brignoni-Ponce* standard, this Court has recognized that the Supreme Court underpinned the standard with a balancing test; the public interest in addressing the continuing problems of alien and drug smuggling must be weighed against the private interest of an individual to be let alone in exercising his or her liberty." *U.S. v. Lopez-Valdez*, 178 F.3d 282, 286 (5th Cir. 1999). The following factors are a helpful guide in the reasonable suspicion calculus:

(1) proximity of the area to the border;

(2) known characteristics of the area;

(3) usual traffic patterns on that road;

(4) agent's previous experience in detecting illegal activity;

(5) information about recent illegal trafficking in aliens or narcotics in the area;

(6) particular aspects or characteristics of the vehicle;

(7) behavior of the driver; and

(8) the number, appearance, and behavior of the passengers.


*Orozco*, 191 F.3d at 581; *see also Brignoni-Ponce*, 422 U.S. at 884-85. "No single factor is determinative; rather, this Court examines each case based on 'the totality of the circumstances

known to the agent, and the agent's experience in evaluating such circumstances.'" *United States v. Chavez-Chavez,* 205 F.3d 145, 148 (5th Cir. 2000) (quoting *United States v. Inocencio*, 40 F.3d 716, 722 (5th Cir.1984) (internal quotation marks and citation omitted)).

The above factors counsel a finding of reasonable suspicion in this case. The van was travelling in a northern direction in an area in close proximity to the border and that area was known by the agents to be frequented by transporters of illegal aliens. *See Aldaco*, 168 F.3d at 150 ("This Circuit has recognized that the proximity of a stop to the border is a paramount factor. ... [In addition, it] is well established that a road's reputation as a smuggling route adds to the reasonableness of the agents' suspicion."). In stark contrast with its riding very low in the rear, the van appeared to have only two occupants.[1]  See *United States v. Cardona*, 955 F.2d 976 (5th Cir.), *reh'g denied*, 961 F.2d 215 (5th Cir.), *cert. denied*, 506 U.S. 942 (1992) (finding reasonable suspicion where "[the vehicle] was riding considerably low to the ground despite the fact that only two persons were visible inside it."). The agents also believed that the van had condensation on its windows.[2]  *See United States v. Garcia*, 732 F.2d 1221, 1225 n.2 (5th Cir. 1984) (finding that

---

[1]Appellant argues that the fact that the van was riding unusually low in the rear has been accorded low weight by this court. *See United States v. Melendez-Gonzalez*, 727 F.2d 407, 412 (5th Cir. 1984); *United States v. Orona-Sanchez*, 648 F.2d 1039, 1042 (5th Cir. 1981); *United States v. Pacheco*, 617 F.2d 84, 86 (5th Cir. 1980). Central to the resolution of each of these cases is the fact, however, that the vehicles in question were apprehended at least fifty miles from the border. *See Melendez-Gonzalez*, 727 F.2d at 409 (60 miles); *Orona-Sanchez*, 648 F.2d at 1040 (50 miles); *Pacheco*, 617 F.2d at 86 (85 miles). The van in this case was apprehended four miles from the border, having been first sighted one mile from the border.

[2]Appellant argues that the agents relied on a mistaken belief that there was condensation on the windows. Appellant points to *United States v. Rodriguez-Rivas*, 151 F.3d 377, 381 (5th Cir. 1998), as authority for the propostion that mistaken perceptions are not given great weight. In that case, the agents thought that the driver was slouching to avoid identification; in fact, he was 5'7". This Court however will credit mistaken perceptions when they are reasonable in light of the circumstances. "It is apparent that in order to satisfy the "reasonableness" requirement of the Fourth Amendment, what is generally demanded of the many factual determinations that must regularly be made by agents of the government ... is not that they always be correct, but that they always be reasonable. ... 'Because many situations which confront officers in the course of executing their duties are more or less ambiguous, room must be allowed for some mistakes on their part. But the mistakes must be those of reasonable men, acting on facts leading sensibly to their conclusions of probability.'" *Illinois v. Rodriguez*, 497 U.S. 177, 185-86 (1990) (quoting *Brinegar v. United States*, 338 U.S. 160, 176 (1949)); *United States v. Morales*, 191 F.3d 602, 606 ("The process does not deal with hard certainties, but with probabilities. Long before the law of probabilities was articulated as such, practical people formulated certain common sense conclusions about human behavior; jurors as factfinders are permitted to do the same--and so are law enforcement officers."). Agent Kelly testified that the windows were translucent and that windows are not ordinarily spray painted

6

condensation on windows led to reasonable suspicion that "the [heavy] cargo was breathing."). These facts, taken together, more than amount to the reasonable suspicion necessary to make an investigative stop. It is important to note, in this respect, that the agents confirmed their observations from a variety of angles. This salutory behavior on the part of the agents is exactly what the Fourth Amendment encourages. *See Terry v. Ohio*, 392 U.S. 1, 22 (1968) (distinguishing reasonable suspicion from "inarticulate hunches.").

For the foregoing reasons, we AFFIRM the district court's denial of the motion to suppress and the appellant's conviction and sentence.

---

black. Given what the agents knew (and should have known) at the time of the stop, their mistaken perception was reasonable.