BURTON L. O'NEILL, Appellant, v. CHARLES F. KEELING, Sheriff, et al., Appellees.

No. 44645.

DECEMBER 12, 1939.

Tobin, Tobin & Tobin and Miller & Ostrus, for appellant.

Carl A. Burkman and Howard M. Hall, for appellees.

HAMILTON, J.—The arrest, in this case, was under a valid warrant; the accused was indicted under the name "Bert O'Neil" and this was the name given in the warrant. Under this warrant, plaintiff was arrested, placed in jail overnight and the following morning he was arraigned. The prosecuting witness was sent for and, being confronted with the accused, at once, stated he was not the man who committed the offense. Whereupon, plaintiff was discharged. He brought this action for damages for false imprisonment. There was a trial, resulting in a directed verdict for defendants, and plaintiff has appealed.

Briefly stated, the facts are these. Matt Baker, a farmer living at Mitchellville, Iowa, was cheated by false pretenses in the purchase of a team of mares owned by a man whose true name was McGowan, but who, at the time, represented himself to be Bert O'Neil. The transaction took place in Des Moines at 1971 South Union street where McGowan was temporarily staying at the home of a man named West. Baker came to this address in response to an ad in the paper. McGowan told Baker

that he lived at Vinton, Benton county, Iowa; that he had moved the mares down from Vinton expecting to get a job on the WPA. In the conversation, he repeatedly referred to the town of Vinton. He gave Baker a receipt signed "Bert ONeil". He wrote Baker a card, signing it "Bert O'eil". He purchased an old nag from Baker, giving his promissory note, which he signed "Bert O'neil". When Baker discovered he had been swindled he attempted to locate the culprit. He went to the address on South Union street, but was told he had gone to East Des Moines. Baker addressed a postcard and a letter to "Bert O'Neil, General Delivery, Des Moines, Iowa", but these were not called for and the letter was later returned to the writer. He wrote a letter to the postmaster at Vinton, asking him if such a person received his mail there and, if not, to give him the address of such person, if he knew the same. The postmaster simply wrote "Garrison, Iowa" on the margin and returned the letter to Baker. The matter was turned over to the grand jury and an indictment was returned.

In addition to the above facts, Baker described the horse trader McGowan, whom he knew only by the name of Bert O'Neil, as being a man of ruddy or sandy complexion, between the ages of 38 and 42, about 5 feet, 9 inches in height and weighing about 180 pounds. No one, including the grand jurors, connected with the case, other than Baker, knew McGowan; hence, they had no basis for a mental picture of the man named in the indictment and warrant except what Baker had given them by the above description. Baker did not know the plaintiff, Burton L. O'Neill, and this was likewise true as to the officers and grand jurors. Armed with a valid warrant and the information received from Baker, Sheriff Keeling, through his deputy, Harley Thornton, on December 5, 1935, the day the warrant was issued, wired Sheriff Fry at Vinton, Benton county, Iowa, to:

"ARREST BERT O'NEIL WANTED HERE CHARGE OBTAINING MONEY BY FALSE PRETENSES STOP (giving above description) REPORTED IN OR NEAR GARRISON IOWA POSTMASTER AT VINTON MAY HAVE ADDRESS STOP WILL COME FOR O'NEIL UPON RECEIPT OF YOUR ADVICE HE IS IN CUSTODY."

Parenthetically, it should be stated that plaintiff was commonly called "Bert" or "Burt". He lived at Vinton and was engaged in buying and selling horses.

Sheriff Fry, who had resided in Benton county for 36 years, testified that he had never known of any one in the vicinity of Vinton or Benton county by the name of Bert O'Neil aside from plaintiff; and that he had always known plaintiff as "Bert". The fact that plaintiff was commonly called by this abbreviated name or nickname "Bert" or "Burt" is fully proven; in fact, plaintiff admitted this to be true. Plaintiff was well known to Fry and, when he received the telegram, he said he made no search for anyone else. He waited until plaintiff and his sons returned from South Dakota, where they had gone for horses, to make the arrest; this was December 20, 1935. He approached plaintiff in a cafe and said, "Bert, I have a warrant for you. Walk over to the office with me." At the office, Fry displayed the telegram which plaintiff read. He, at once, called attention to the fact that the description did not fit him.

Again, parenthetically, plaintiff was 55 years of age, 6 feet and 1 inch in height, dark complexioned and weighing about 165 pounds.

Sheriff Fry phoned the sheriff's office in Des Moines, in the plaintiff's presence. In that telephone conversation, Fry said, "There is some mistake here. This is not the man you want. He does not fit the description." Fry told plaintiff they had him indicted and were coming after him that evening and that he would have to put him in jail, but plaintiff talked Fry out of this, saying, "I won't run away. I haven't anything to run away for." It was arranged that Sheriff Fry was to call for plaintiff at his home when the officers arrived. When Thornton arrived, plaintiff protested vigorously, stating that he did not know anything about the matter and that he did not want to go to Des Moines. About all Thornton said to this was, "We will find out about this when we get to Des Moines." Plaintiff's son wanted to go along to Des Moines, but Thornton said, "No", adding, "This thing will probably be cleared up in the morning. Your father will be home tomorrow." There is some dispute as to some of the foregoing facts, but we must take the view most favorable to plaintiff, where a verdict has been directed against him.

Here we have two men answering to the description contained in this warrant. The fact that one was operating under an assumed name should make no difference in the solu-

tion of the problem. The fair reasonable assumption from a full and fair consideration of all the evidence, viewed from the standpoint of the defendant officers, would be that this man, who actually committed the offense, lived in or in the vicinity of Vinton, Benton county, Iowa. It was purely coincidental that there lived at Vinton a man well and commonly known by the very name contained in the warrant and that he was another horse dealer and, to make the matter still more convincing that he was the man intended, that he was the only person by that name in the vicinity of Vinton or Benton county. He was, in fact, the wrong man. We have, then, a case of the arrest of a man by the same name who was supposed to live in the same place; the man arrested, in fact being the only man in the place bearing the name. Under such circumstances, what are the rights and privileges of the officers making the arrest? After a careful reading of all the authorities, which, of course, are not in complete accord, we have adopted the rule which we conceive to be most conducive to justice and in harmony with the better weight of authority and which appeals to sound reason and logic as follows: That an officer is privileged to make an arrest under a valid warrant in which the person is described therein by name only, when the person arrested bears that name or is commonly known by such name, and is the person intended, or where the officer in the exercise of due diligence in good faith reasonably believes him to be the person intended. This precise question has never been before this court and there are but few cases, having similarity of facts, available. Perhaps, the latest authoritative statement is found in 22 Am. Jur. 405, par. 73, under the headnote "Arrest of Wrong Person" from which we quote the portion deemed applicable to this case:

"* * * The officer is liable if he fails to take proper precautions to ascertain the right person, if he refuses information offered that would have disclosed his mistake, or if he detains the person an undue length of time without taking proper steps to establish his identity. If the person named in the warrant is arrested, the officer is justified, although, by mistake, the wrong name was inserted. Where two men are of the same name and the name is that stated in the warrant and the officer arrests one whom he knows is not the one intended, or does not in good faith believe him to be so, the warrant is not a justifi-

cation. But if he in good faith arrests one of two men having the same name which is stated in the warrant, believing him to be the one intended, he is justified.''

The foregoing text is in harmony with Blocker v. Clark, 126 Ga. 484, 54 S. E. 1022, 1023, 7 L. R. A., N. S., 268, 8 Ann. Cas. 31, a leading case, very well considered, which is referred to in all the authorities and in which we find the following pertinent pronouncement:

''The officer may take into consideration any information that he may receive outside of the terms of the warrant, in order to locate the person named therein, but his duty at last is to arrest the person named. * * * If the person is described by name only, he must likewise exercise due diligence in determining whether the person arrested bears the name specified in the warrant, and the arrest will be justified if the person bears the name; although a detention might be illegal when information comes to the officer that the person so arrested is not the person against whom the warrant was issued.''

In applying the rule of good faith, the learned court in the Georgia case, very logically and justly, reasons as follows:

''We are aware of the importance of the question involved as to the responsibility of an officer executing a warrant where there are two or more persons bearing the name stated in the warrant. If it should be held that the officer is protected when he acts in good faith, although the wrong person may be arrested, cases will arise where a person who is innocent will be deprived of his liberty, and will have no redress for the wrong. On the other hand, if it is held that the officer acts at his peril, the administration of the law through the execution of warrants is impeded, and criminals may escape on account of the timidity or caution of the officers. We are aware that the rule that the officer in such cases acts at his peril has been laid down by courts of respectable standing; but we think that the rule of good faith is more consonant with our system as indicated by the provisions of the code, which declares that if the imprisonment is by virtue of a warrant, neither the party bona fide suing it out nor the officer executing the same is guilty of false imprisonment, though the warrant be defective in form, and void for want of jurisdiction. In such cases the good faith must

be determined from all the circumstances. Civil Code [1895], §3852. If good faith will protect an officer who deprives a citizen of his liberty under a void warrant, it would seem for a stronger reason that it should protect an officer who is armed with a valid warrant, and who after exercising due diligence, acting in perfect good faith, makes a mistake as to the identity of the person named in the warrant. * * * Good faith implies due diligence. Good faith may be negatived by evidence of negligence. The failure to exercise ordinary care in a transaction like the one under consideration is inconsistent with good faith."

In a California case, Kalish v. White, 36 Cal. App. 604, 173 P. 494, 495, a man known to the officers was actually indicted and a warrant issued for his arrest as the supposed offender. He was apprehended and extradited from another state and brought back against his will and protestations of innocence. In that case, as in the instant case, it was discovered that the man arrested was the wrong person, and that another person by the same name was the guilty party. The court announced the rule of law as follows:

"When a warrant, valid in form and issued by a court of competent jurisdiction, is placed in the hands of an officer for execution, it is his duty without delay to carry out its commands; and the law is well settled that for the proper execution of such process the officer incurs no liability, however disastrous may be the effect of its execution upon the person against whom it is issued. (Newell on Malicious Prosecution, sec. 70; 11 R. C. L. 795.) * * * it appears that the process, which was regular in form and legally issued, described the plaintiff by his name, which is the usual way (11 R. C. L. sec. 12, p. 799), and that he was in fact the person for whom it was intended. Under such circumstances, even if Minehan had been in doubt as to whether or not the plaintiff was the person who committed the crime, he was not bound to decide that question; and he was certainly acting within his duty when he took the plaintiff into custody, and thus permitted the question of identity to be ultimately decided. Under the undisputed facts of the case the warrant is a complete defense to this action

against the officer. (Cox v. Durham [8 Cir.], 128 Fed. 870, 63 C. C.A. 338; Madden v. Meehan, 153 Ky. 648, 156 S. W. 116.)''

See, also, Vol. I, Restatement Law of Torts, 283, par. 125, under headnote ''False Imprisonment'' which states that an arrest, under a warrant, is not privileged unless the person arrested:

''(a) is a person sufficiently named or otherwise described therein and is, or is reasonably believed by the actor to be, the person intended, or

''(b) although not such person, has knowingly caused the actor to believe him to be so.''

With the foregoing legal principles in mind, we turn to the record in the instant case. In his decision, the trial court seemingly gave no consideration to the question of good faith although the evidence to some extent extended into this field of inquiry. In fact, the issue of good faith was not expressly raised by the pleadings and there might be some doubt—a question we do not decide—as to whether evidence of good faith was competent under the pleadings. Since the trial court confined himself to one issue and since the pleadings and the evidence may not be the same in the event of a new trial, we will refrain from any discussion of the evidence bearing on the good faith of the officers and confine ourselves to the one issue determined. The trial court held, as a matter of law, that the grand jury intended to indict the plaintiff, Burton L. O'Neill, under the name of Bert O'Neil and the warrant was intended for him and, this being true, the arrest was privileged and the officers protected. Appellant contends that this was a jury question. He also questions the competency of the testimony of some of the grand jurors bearing on the question as to the person they intended to indict. These grand jurors, as witnesses for the defendant, over proper objections by plaintiff, were asked the question: ''Whom did you intend to indict?'' Each answered, in substance, ''Bert O'Neil of Vinton, Iowa.'' As this line of testimony is the only evidence mentioned by appellees in support of the court's ruling, we will direct our attention to this question.

In this state, we have applied to grand jurors the rule applicable to petit jurors that a juror may not impeach his

verdict. State v. Gibbs, 39 Iowa 318; State v. Davis, 41 Iowa 311. The minutes of the testimony, taken before the grand jury and filed with the indictment, constitute the record basis for the finding of the indictment and this record may not be added to by calling on the grand jurors in the trial of the case to give additional testimony, such as was called for by the question propounded to these grand jurors above set out, when the same tends to impeach the indictment. As to the person named in the indictment, the instrument speaks for itself. As to the person *intended* to be charged under the name used, it was and could have been none other than the person whom it was believed perpetrated the crime. This person was, of course, the man who sold the team of mares to Mr. Baker. When simmered down, the testimony of these witnesses on cross-examination amounts to this:

"We *intended* to indict the man who defrauded Mr. Baker and we got the impression, from the testimony before the grand jury, that he lived at Vinton, Iowa."

None of the grand jurors knew the plaintiff or McGowan. No one connected with this case, prior to the time of his arrest, knew plaintiff. There wasn't a thing known to the grand jurors, as shown by this record, which in any way connected plaintiff with the commission of the crime. He did live at Vinton, Iowa. He was commonly called "Bert", but these facts were not known to the grand jurors nor to the prosecuting witness nor any other witness that was before the grand jury. The purpose of this testimony was to show that the plaintiff, Burton L. O'Neill, was in truth and in fact the person indicted. This being shown, it would necessarily follow that the warrant was likewise issued against him, and, since the officers arrested the person intended, the warrant, regular on its face and issued by a court of competent jurisdiction, would be a complete protection to the officers. It must be admitted that this would be the most bomb-proof refuge possible, but it seems to us this testimony was incompetent in that it tends to impeach the indictment and would be a very dangerous precedent.

Any rule that would open up a way by which grand jurors might be permitted to impeach their own record would be against public policy. The question called for the intent or mental

process of the jurors which would be impossible of refutation by direct proof. If such evidence was competent in this case, it might be used in any other similar case. Counsel for appellees have cited no authority and our independent investigation has failed to reveal any case sustaining the competency of this kind of testimony on the part of the grand jurors and we find nothing in any of the statutory provisions of this state which tend to sustain the same. Sections 13724-13726, Code of 1935, are the sections relating to secrecy of proceedings, disclosure of proceedings under certain circumstances, and privilege of grand jurors, but we find nothing in these statutes which would aid the appellees. There was evidence before the grand jury from which it might be said legitimate inferences could be drawn which would be at variance with the testimony given by the grand jurors. A case might be assumed where the grand jurors would not agree and this would result in a contest over what took place in the minds of the various members of the grand jury, touching their intentions and purposes. To admit this sort of testimony would clearly be against good public policy. Even if the testimony of the grand jurors were permitted, the positive declaration given on direct examination was so weakened, when they were compelled to admit, on cross-examination, that they intended to indict the person who committed the fraud, as to make its weight and credibility a question for the jury.

The issue as to what person was *intended* by the name used in the warrant may be shown by all the competent facts and circumstances surrounding the transaction out of which the indictment arose and the warrant issued. As to this issue, under the record in the instant case, we think the decision should have rested with the jury. This being the only question passed upon by the court, it follows that the court was in error in directing a verdict. (Italics ours.)

Our own cases and some of the cases from other jurisdictions bearing generally on the question of false imprisonment and the rights and privileges of officers in making arrests with or without a valid warrant are: Allen v. Leonard, 28 Iowa 529; Holmes v. Blyler, 80 Iowa 365, 45 N. W. 756; Henke v. McCord, 55 Iowa 378, 7 N. W. 623; Wilson v. Lapham, 196 Iowa 745, 195 N. W. 235; Tryon v. Pingree, Mich., 67 Am. St.

Rep. 398, 410, note; King v. Robertson, 227 Ala. 378, 150 So. 154; Jones v. Van Bever, 164 Ky. 80, 174 S. W. 795, L. R. A. 1915E, 172; Brown v. Hadwin, 182 Mich. 491, 148 N. W. 693, L. R. A. 1915B, 505; Drake v. Keeling, Iowa, 287 N. W. 596. The case is, accordingly, reversed.—Reversed.

OLIVER, C. J., and MITCHELL, HALE, BLISS, STIGER, and SAGER, JJ., concur.

MILLER, J., takes no part.