STATE of Iowa, Appellee,

v.

Elliott Charles RICEHILL, Appellant.

No. 53968.

Supreme Court of Iowa.

June 23, 1970.

Paul H. Kinion and R. Fred Dumbaugh, Cedar Rapids, for appellant.

Richard C. Turner, Atty. Gen., G. Douglas Essy, Asst. Atty. Gen., and William G. Faches, County Atty., Cedar Rapids, for appellee.

RAWLINGS, Justice.

Charged by indictment with the crime of murder, defendant entered a not guilty plea. Trial jury found him guilty of murder in the second degree. Defendant's motions in arrest of judgment and for new trial were overruled, judgment entered and he appeals. We affirm.

It is here claimed trial court erroneously, (1) admitted in evidence a wristwatch obtained from defendant in the course of a police station "booking" of him on a prior arrest for vagrancy, and (2) submitted verdict forms to the trial jury in a prejudicially improper chronological order.

Although defendant does not, on this appeal, question quantum of proof to sustain a conviction, the first issue raised, supra, requires a prefatory presentation of the factual situation involved.

The record discloses Mabel Bigley, a Cedar Rapids resident, was murdered July 2, 1968.

July 3, 1968, defendant was arrested on a charge of vagrancy.

July 24, 1968, a preliminary information was filed by which he was accused of the murder.

Counsel was appointed to represent him, and September 5, 1968, a preliminary hearing was held after which he was bound over to await grand jury action.

October 11, 1968, an indictment was returned by which defendant was accused of the felony.

In course of trial Valentine Chester Davenport, Jr., testified he met defendant July 2, 1968, about 12:00 at night in a Cedar Rapids tavern. Davenport stated defendant there struck up a conversation with him and said he had "found a dead woman in the next apartment where he lived." This witness and defendant stayed at the tavern until 2:00 in the morning, then left with two lady friends, one of whom was Linda Beltram. After "dropping one of the women off", Davenport, Linda Beltram and defendant went to the apartment building where the murder victim had resided. Davenport stated that with defendant he entered the dead woman's quarters, and there "observed a woman bare naked and face down." He then

returned to Linda Beltram's adjacent apartment. Defendant later came there. Miss Beltram and defendant then returned to the victim's rooms. Davenport said he remained in the Beltram apartment and drank a can of beer. He also related that before defendant and Linda returned to the Bigley apartment defendant said, "they had been in there before and that they might get into a lot of trouble because there might be some fingerprints around there." Davenport then went to the Cedar Rapids Police Station.

Linda Beltram also appeared as a State's witness. She stated defendant had moved in with her occasionally from May until July and was in fact staying there the night of the murder. This witness also said she saw defendant at a tavern in Cedar Rapids about 11:00 P.M., July 2, 1968, at which time he indicated to her something was wrong with Mabel Bigley. She and defendant stayed at the tavern until it closed, then left with Davenport and the other woman, ultimately arriving at the apartment building where Mabel Bigley and Miss Beltram lived.

She stated, defendant and Davenport went to Mabel Bigley's rooms where she, Linda, subsequently joined them. This witness related that on entering the Bigley apartment she observed Mabel on the floor. While there with defendant, he tried to give mouth-to-mouth resuscitation to the victim. Later defendant and Linda called the Cedar Rapids Police Department and reported the death.

Captain Judd Longerbeam of the Cedar Rapids Police Department testified he went to Mabel Bigley's quarters early the morning of July 3, 1968, and there found her nude body on the floor. Later he saw defendant and Linda Beltram enter the building, and proceeded to question the former who stated "he had been in the apartment with Mrs. Bigley at around 5:30 P.M., and gave her mouth-to-mouth resuscitation." This officer then asked that Linda and defendant accompany him to the police station.

Denton E. Schultz, a Cedar Rapids Police Department Detective, was another State's witness. He was on duty the early morning hours of July 3, 1968, and at the station talked to defendant, Linda Beltram and Davenport. At that time this officer observed defendant was wearing a pale yellow or ivory shirt with a discolored stain. Schultz further stated a wristwatch worn by defendant had a broken crystal with "caked blood on it." Defendant was then booked on a charge of vagrancy. In the course of that procedure defendant's watch, and other personal effects, were taken from him. Officer Schultz testified, at time of arrest and booking on the vagrancy charge, defendant was not a prime suspect in connection with the murder.

During the felony trial defendant's counsel objected to introduction of exhibit 47, being the bloodstained watch defendant was wearing July 3, 1968. Objection interposed was that its use in evidence violated defendant's right to be free from unreasonable search and seizure as guaranteed by the Fourth and Fourteenth Amendments to the United States Constitution. The objection was overruled and the watch admitted in evidence.

The record further discloses that subsequent to defendant's arrest on the vagrancy charge several photographs were taken of his body. Fingernail scrapings were also obtained which, with the watch and other articles seized, were subsequently sent to the Federal Bureau of Investigation for analysis.

Two agents of the Bureau testified on behalf of the State regarding conclusions reached in analyzing the material sent them. Among other things they identified hair and blood samples, but as stated by one of these witnesses, blood stains on the watch were of an insignificant quantity to type or group.

I. The initial question presented focuses upon the vagrancy arrest of defendant with attendant in-station booking procedure, more specifically seizure of his wrist-

watch and its subsequent evidentiary use in course of the murder trial.

Defendant argues this arrest was a subterfuge or pretext by which to detain him while conducting an investigatory search in violation of his rights under the Fourth Amendment.

In that regard it is now understood this constitutional provision is enforceable against the States through the Fourteenth Amendment. See State v. Spier, Iowa, 173 N.W.2d 854, 857, and State v. Cullison, Iowa, 173 N.W.2d 533, 538.

II. At the outset we are called upon to determine whether, (1) the vagrancy arrest was based upon probable cause, and (2) correlative seizure of the wristwatch was so tainted as to preclude its introduction in evidence.

An officer has "probable cause to arrest" when the facts and circumstances known to him would warrant a prudent man to believe an offense has been or is being committed. And, he is protected in so acting even though the arrested person is subsequently found innocent. Henry v. United States, 361 U.S. 98, 102, 80 S.Ct. 168, 171, 4 L.Ed.2d 134, and 19 Drake L. Rev. 441, 444.

So it is essential we view the foundational factors which prompted an arrest of defendant for vagrancy.

The record discloses, without dis-. pute, Detective Denton E. Schultz was twice told by the accused he lived at two different places but inquiry revealed these representations were false.

In determining whether this and related circumstances, supra, provided probable cause for the initial arrest, we deal with factual and practical considerations of life on which prudent men act, not with technicalities. This in turn means the arrest was justified if there existed reasonable ground for belief of guilt, rather than knowledge of evidence sufficient to con-

vict. Brinegar v. United States, 338 U.S. 160, 174–176, 69 S.Ct. 1302, 1310–1311, 93 L.Ed. 1879. See also Terry v. State of Ohio, 392 U.S. 1, 20–22, 88 S.Ct. 1868, 1879–1880, 20 L.Ed.2d 889, and Beck v. Ohio, 379 U.S. 89, 96, 85 S.Ct. 223, 228, 13 L.Ed.2d 142.

Viewing the facts presented in light of the foregoing criteria, it would be less than plausible for this court to now hold the arrest of defendant for vagrancy was devoid of probable cause.

By the same token, we have no choice but to hold the arrest was *not* effected as a mere pretext or subterfuge.

Furthermore, the fact that an arrest was subsequently made on the murder charge does not, in this case, alter our conclusion. The adoption of a contrary view would, in effect, serve to unjustifiably jeopardize any felony arrest of one previously apprehended for commission of a misdemeanor. Neither are "inventory" seizures relative to a lawful misdemeanor arrest ipso facto inadmissible in a subsequent felony trial. As a caveat see, however, Waller v. Florida, 397 U.S. 387, 90 S.Ct. 1184, 25 L.Ed.2d 435.

III. Next to be considered is the seizure of defendant's wristwatch during the vagrancy "booking" or "inventory" process.

Dealing with that subject in State v. Entsminger, Iowa, 160 N.W.2d 480, this court held, handwriting exemplars secured from an accused in the course of "booking" him on arrest could later be used during trial, for comparative purposes, and in so holding said at 160 N.W.2d 483–484:

"The legality of the seizure of the documents rests upon the reasonableness thereof. 'For "what the Constitution forbids is not all searches and seizures, but unreasonable searches and seizures." Elkins v. United States, 364 U.S. 206, 222, 80 S.Ct. 1437, 1446, 4 L.Ed.2d 1669 (1960)'. (Additional authority cited). The purpose of Amendment 4 is not to prevent all searches

—only unreasonable searches and seizures. (Authorities cited). The seizure, as well as the search, must not be unreasonable. (Authority cited).

" 'What is a reasonable search is not to be determined by any fixed formula. The Constitution does not define what are "unreasonable" searches and, regrettably, in our discipline we have no ready litmus-paper test. The recurring questions of the reasonableness of searches must find resolution in the facts and circumstances of each case.' United States v. Rabinowitz, 339 U.S. 56, 63, 70 S.Ct. 430, 434, 94 L.Ed. 653. See also State v. Raymond, supra, 258 Iowa 1339, 142 N.W.2d 444.

" '(T)here is "no ready test for determining reasonableness other than by balancing the need to search (or seize) against the invasion which the search (or seizure) entails." Camara v. Municipal Court, 387 U.S. 523, 534, 536–537, 87 S.Ct. 1727, 1735, 18 L.Ed.2d 930 (1967).' (Additional authority cited).

"The question is whether in all the circumstances of this 'booking' process defendant's right to personal security was violated by an unreasonable search and seizure.

" \*     \*     \*     \*     \*     \*

"This is standard and necessary under modern police practice which calls for a thorough search at the station house of any person who is taken into custody. Such searches are not unreasonable; they are an integral part of efficient police procedure. (Authority cited). These circumstances rendered initiation of the search and seizure permissible to the extent used here. The scope of this search was strictly tied to and justified by this 'booking' procedure. (Authority cited). It was not of such intolerable intensity as to be unreasonable. (Authority cited)."

■ Holding as we do, the "booking" of defendant was a lawful procedure, it follows the wristwatch was in open view and the police officers were not required to close their eyes to its existence. As stated in Harris v. United States, 390 U.S. 234, 236, 88 S.Ct. 992, 993, 19 L.Ed.2d 1067: "It has long been settled that objects falling in the plain view of an officer *who has a right to be in the position to have that view are subject to seizure and may be introduced in evidence.*" (Emphasis supplied.)

Admittedly Chimel v. California, 395 U.S. 752, 768, 89 S.Ct. 2034, 2042–2043, 23 L.Ed.2d 685, partially overruled Harris, supra. It still remains, however, the court specifically restricted its newly adopted position in Chimel to the territorial scope of warrantless searches attendant upon arrest, an element not here involved. Upon this basis we are persuaded the foregoing quote from Harris still stands as an accepted standard. In support hereof see also Ker v. State of California, 374 U.S. 23, 43, 83 S.Ct. 1623, 1635, 10 L.Ed.2d 726; Abel v. United States, 362 U.S. 217, 238, 80 S.Ct. 683, 696–697, 4 L.Ed.2d 668; State v. Evans, Iowa, 169 N.W.2d 200, 206, and State v. Levy, Iowa, 160 N.W.2d 460, 468–469.

IV. Additionally, no element of communicative self-incrimination is here involved.

In Schmerber v. State of California, 384 U.S. 757, 86 S.Ct. 1826, 16 L.Ed.2d 908, the Fourth Amendment was invoked with regard to the challenged taking of a blood specimen from one suspected of operating a motor vehicle while under the influence of intoxicants.

The court there held probable cause existed for the felony arrest of defendant (though the arrestee was later prosecuted for a misdemeanor) and the non-communicative taking of blood did not violate any Fourth Amendment rights. See also Warden, Maryland Penitentiary v. Hayden, 387 U.S. 294, 302–303, 87 S.Ct. 1642, 1648, 18 L.Ed.2d 782; Breithaupt v. Abram, 352 U.S. 432, 77 S.Ct. 408, 1 L.Ed.2d 448; and 52 Iowa L.Rev. 344.

Resultantly we conclude, defendant's wristwatch was lawfully seized, and its

subsequent evidentiary use in course of the murder trial did not constitute reversible error.

Additional authorities lending support to this holding are Worthy v. United States, (D.C.Cir.), 409 F.2d 1105, and People v. Mazzone, 57 Misc.2d 285, 292 N.Y.S.2d 477. See also Annos. 19 A.L.R.3d 727, 739–743.

V. What has been said, supra, does not mean, however, that purely pretentious arrests may be employed as a means by which to secure incriminatory evidence.

This is clearly demonstrated by Davis v. Mississippi, 394 U.S. 721, 89 S.Ct. 1394, 22 L.Ed.2d 676, cited and relied on by defendant in support of his position.

But Davis is readily distinguishable from the case at bar. *There the State conceded defendant had been apprehended without probable cause, for the sole purpose of obtaining his fingerprints.* In holding a resultant rape conviction could not stand, the court said, loc. cit., 394 U.S. 728, 89 S.Ct. 1398: "We have no occasion in this case, however, to determine whether the requirements of the Fourth Amendment could be met by narrowly circumscribed procedures for obtaining, during the course of a criminal investigation, the fingerprints of individuals for whom there is no probable cause to arrest. For it is clear that no attempt was made here to employ procedures which might comply with the requirements of the Fourth Amendment: the detention at police headquarters of petitioner and the other young Negroes was not authorized by a judicial officer; petitioner was unnecessarily required to undergo two fingerprinting sessions; and petitioner was not merely fingerprinted during the December 3 detention but also subjected to interrogation. The judgment of the Mississippi Supreme Court is therefore reversed." To the same effect is Mills v. Wainwright, (5 Cir.), 415 F.2d 787.

Other cases cited by defendant, on which he leans heavily, have been examined and found to be either factually inapplicable or not persuasive.

■ VI. The remaining claim made on appeal is both stated and resolved adverse to defendant in State v. Alford, 260 Iowa 939, 151 N.W.2d 573. There we said at 260 Iowa 944, 151 N.W.2d 576: "Defendant claims the court erred in the order in which the forms of verdict were submitted to the jury. He argues that since it is presumed a man is innocent until proven guilty, it logically follows the first form of verdict should also be for not guilty.

"This is a novel concept and is at odds with the traditional order in which forms of verdict have been submitted to the jury in criminal cases. It casts serious reflection upon the jury system, of which we have been so proud, to suggest that the decision of a jury might rest on such a tenuous basis as the order in which the forms of verdict appear in the instructions. We have more confidence in juries than that. We therefore hold this contention to be without merit."

Further discussion of the subject will only serve to needlessly extend this opinion.

Affirmed.

All Justices concur, except REES, J., who takes no part.