Peter CHILDREN, Appellee,

v.

James R. BURTON, Victor Dunn, and
City of Charles City, Iowa,
Appellants.

No. 66367.

Supreme Court of Iowa.

March 16, 1983.

Rehearing Denied April 18, 1983.

Walter C. Schroeder, Mason City, for appellant Burton.

Don W. Burington of Laird, Burington, Bovard, Heiny, McManigal & Walters, Mason City, for appellant Dunn.

Jim D. DeKoster of Swisher & Cohrt, Waterloo, for appellant Charles City.

Lex Hawkins, Glenn L. Norris, and George F. Davison, Jr., of Hawkins & Norris, Des Moines, for appellee.

UHLENHOPP, Justice.

In this appeal we review a judgment for $1,250,000 awarded to plaintiff Peter Children in a false arrest action against two Charles City police officers—Victor Dunn and James R. Burton—and their employer, the City of Charles City. The officers and city appeal the trial court's overruling their motions for directed verdict, judgment notwithstanding verdict, and new trial.

Both sides presented evidence of the background of the arrest. In late 1978 and early 1979 a rash of indecent exposure incidents were reported in various Charles City and Mason City stores. They involved a man masturbating under racks of ladies' clothing. One individual appeared to be involved. Descriptions of the man seen in the stores were similar, his sexual acts were similar, the testimony refers to "the" suspect or flasher, and, indeed, one man was ultimately convicted. Regarding the Charles City incidents, the first occurred in December 1978 at a J.C. Penney store in Cedar Mall and was witnessed by Joyce Winters. On January 25, 1979, two further incidents occurred at Cedar Mall, one at Spurgeon's and one at Stevenson's. Sherry Tweed, a clerk at Spurgeon's, reported to Officer Burton at the store "That a man had been masturbating down by the—underneath this clothes rack, that he had gotten up and left the store." She later testified that this was based on a report by a customer that a man was lying between the racks playing with himself with his parts exposed and on Tweed's seeing the man pull up his zipper when he got up. The customer testified to seeing a man masturbating under clothes racks with his genitals exposed. June Temple, a clerk at Stevenson's, also reported an incident the same evening when a man came into the store twice. She stated to Officer Burton, "I just had some guy expose himself to me." At trial she testified:

> Q. I see. Did you or did you not tell him [Burton] that there was a man in there that exposed himself or words to that effect? [Objection, ruling.] The Witness: Yes, I did.

The police complaint sheet for this incident stated, "Red Owl, Gibson, Roberts, K-Mart Penneys Ref exposure at Spurgeons and Stevensons." Burton's memo for the police file stated: "Stevensons 1-25-79. June Temple. 5'8"—5-9 Dirty dishwater Blonde Hair or Gray. 34-35 Years old. Down on his knees with both hands inside his pants jacking off." On February 7, 1979, Chris Rissler, another of Stevenson's clerks, reported a similar incident. Her description of the man matched previous ones. She reported to Officer Skillen, "From the desk she saw the man she was talking to earlier sitting by the floor—on the floor by the

rack. He had his penis out and was masturbating."

Officer Burton, assigned to the night shift, headed up an investigation of these incidents. He also worked with the Mason City Police Department on the case. Officer Dunn, assigned to the day shift, was not involved in the investigation, as all the reported incidents occurred at night. Dunn was aware of the incidents, however, and of the ongoing investigation, and he had seen the police logs concerning the incidents. He had also seen a composite drawing of the suspect that the Mason City and Charles City police departments issued, and he had casually conversed with June Temple about the incidents. Dunn testified in answer to questions by Children's attorney on direct examination:

Q. And isn't it true that before April the 8th, 1979, you had talked to June Temple or she had talked to you, really I think it was, about these incidents? A. Yes. She had asked me one time when I was patrolling through the mall if we had caught the subject yet or the suspect.

Q. Now, this was before April 8th? A. As I recall, it was before April 8.

Q. And she brought the subject up to you, "Had they caught the guy, yet?" A. That's correct.

On Sunday afternoon, April 8, 1979, June Temple, who had reported one of the January incidents, saw a man in Stevenson's whom she believed was the man involved in the January incident at Stevenson's. She went to Patrick Hawk, manager of Tradehome Shoe Store in the mall. Hawk testified:

Q. All right, now, in your own words, as best you can recall, what was said? A. She came into the store that day and asked us to call the police, the flasher was in Stevenson's. We—I asked her if she was—first I asked her if—if he was exposing himself, and she said no, he's just in the store; and I instructed one of my part-time people to call the police, and another employee, Dave Fisher, I asked

to come with me. We wanted to go down and make sure this was the flasher.
He further testified:

Q. And if you'll tell me as best you recall what that conversation was. A. When we got out into the hallway and started down toward the Stevenson store, I asked, "Are you positive this is the flasher?" She said, "Yes, I'm positive it's him." We continued down the hallway until we got to the fountain, which is very close to the Stevenson's store, and she pointed the man out and said, "That's him. That's the flasher." Again, I asked her, "Are you positive it's him?" She said, "Yes, I am. That's the flasher."

Dave Fisher, a Tradehome employee, testified regarding this occurrence:

Q. And at that time you didn't know why they—beg your pardon? A. I knew June came down. I believe she came down now and said that there was a flasher in her store.

Q. Now, wait a minute. Let's back up a little bit. June came down, and did you hear her say something then? A. Yes, I did.

Q. And what did you hear her say? A. She said that the guy that she thought was the flasher was in the store.

Q. And who was she talking to? You or someone else? A. She was talking to Pat Hawk.

Hawk also testified that two telephone calls were made to the police. He instructed Jim Wandro, a part-time employee, to call the police, but Wandro erroneously reported the presence of an intoxicated person to the police. Hawk himself called back to the police dispatcher. He testified that he told the dispatcher June Temple had identified the man in their store as the flasher and that he requested a policeman immediately, and the dispatcher responded that someone was on the way.

The dispatcher testified:

Q. And you just tell me as best you recall what was said to you by someone. A. It was—came from the Tradehome Shoe Store, and he said that there was somebody acting strange and that they were possibly intoxicated.

Q. And what did you do in response to that? A. I called Officer Dunn by radio and advised him that there was an intoxicated person at the Tradehome Shoe Store.

Q. And tell me if you can from memory or from your log what time you called Officer Dunn and told him that? A. That would have been about 4:10 p.m.

Q. Okay. Did you get a later call from someone at the mall? A. Yeah, about 4:11 got another call back.

Q. Now, was that the same person or do you know? A. I don't know.

Q. And what was the conversation that you got or had with that person? A. Well, they advised that the person that was called in about being intoxicated was—had been identified by a clerk as the exposure subject.

Q. Exposure subject, did you say, or suspect? A. Suspect.

Q. All right. Did you misspeak? A. Misspoke.

Q. All right. And then what did you do in response to that? A. I called Officer Dunn back by radio and advised him of the change in the call.

Q. And what did you tell him as best you recall? A. I advised him that the intoxicated person call was the exposure suspect, and they just left by the south door.

When Dunn arrived at the mall parking lot, Patrick Hawk pointed out Peter Children to him. Children was in a nearby car, and Dunn approached to investigate. After talking with Children and his companion, Elizabeth Conway, Dunn ascertained that Children was not intoxicated. Children was in the driver's seat, but he could not produce a driver's license or other identification. Dunn asked if Children would accompany him to the police station. Upon Children's refusal, Dunn did not press the matter and let Children go on the condition that Mrs. Conway, who did have her driver's license, would drive.

Dunn then went to the mall entrance where he met Tradehome manager Hawk. Hawk asked Dunn why he let Children go, and relayed to Dunn that June Temple had identified Children as the flasher. Hawk testified as to events following his call to the police:

Q. Very well. All right. Now, after you had done that, what did you do? A. I came back out of Wandro's. Dave Fisher in the meantime had followed Mr. Children out and copied down his license plate number; and when I was coming out of Wandro's, Mr. Dunn was coming into the mall. I approached Mr. Dunn and said, "What are you doing? That guy's the flasher. Why didn't you arrest him?" And he asked me who had told me this, and I said June Temple, and he immediately went into Stevenson's, and I followed him into Stevenson's.

Children's attorney elicited these events on direct examination of Dunn at the trial:

Q. Okay. Just tell the jury what happened after you got in the mall. A. Pat Hawk, the manager of Tradehome, came up and said, "What'd you leave him go for? He's the flasher. June recognized him."

Q. Then what did you say? A. I just looked at him. I just walked by Stevenson's, and I asked—or June Temple was there along with Sally Snyder, and so I asked her—I asked—I said, "Are you sure it's him?" and she said "Yes, yes, I'm sure." I asked her if she could identify him, and she said she could, so we walked back out of the south entrance and about that time the vehicle was moving. Miss Conway was driving, so I stuck out my hand and she stopped, and I walked over to the vehicle or around in front of the vehicle to the passenger side where Mr. Children was riding, and I think I knocked on the door then or the window. I looked at June Temple, and I said, "Is this the man that was in the store?" and she said, "Yes," and at that time I placed Mr. Children under arrest.

Q. Now, did you tell me when I took your deposition that Mr. Hawk had made those statements to you? A. Yes, I did.

Q. You did. As I understand it, you said to June Temple—what did you say to

her when you walked up to her? A. I said, "Are you sure that it's him?"

Q. That's exactly what you said? A. Yes, sir.

Q. "Are you sure that it's him?" A. Positive.

Q. And she said what? A. "Yes."

Q. Is that all the conversation you had with her at that time? A. No. I asked her if she could identify him.

Q. Okay. A. And she said yes.

Temple's version of this conversation with Dunn was as follows:

Q. And tell me what the conversation was then. A. He wanted me to go out and identify the man.

Q. Did he say anything more to you than that? A. I don't remember.

Q. Did you then go with him? A. Yes.

Q. And just tell me what was said between you and Officer Dunn. A. He asked me if that was the man that was there on January 25th, and I said yes, it was.

Q. You—you when you went out with him, did you see Peter Children then in his car? A. He got out of his car, yes.

Q. And was Mrs. Conway with him at that time? A. I don't remember.

Q. Don't remember. How close did you get to him at that time? A. Two feet.

Q. Okay. Was there any doubt in your mind that that was the same man that you saw in your store on January 25th of 1979? A. No.

This was the point at which Dunn placed Children under arrest.

Dunn transported Children to the police station and Mrs. Conway followed in Children's car. Upon arriving at the station, Dunn phoned Burton, as he knew Burton was heading up the investigation. Burton arrived shortly and helped Dunn process the case. Dunn and Burton signed a complaint charging Children with indecent exposure based on the Stevenson's incident, but this complaint was not filed. Chris Rissler viewed Children and stated he was not the

suspect, but Temple adhered to her identification. A magistrate was called to set Children's bond, but when a Charles City friend of Children arrived at the station to vouch for him, the magistrate gave permission in a second call for Children's release on his own recognizance. Children and Mrs. Conway left the police station and returned to Mason City. Children was detained approximately an hour and twenty minutes.

While the following events occurred after Children was released, we will state them to relate what ultimately happened. Later on the evening of April 8, Dunn checked the statutes and ascertained that indecent exposure requires actual exposure of the genitals or pubes. Iowa Code § 709.9 (1979). June Temple gave the police a written statement of her knowledge of the incident she witnessed at Stevenson's. After reviewing it, Dunn became concerned that Temple had not in fact seen an exposure. He went through the file and then contacted Temple again. She confirmed that she had only seen the suspect rubbing his genital area over his clothing and had not actually seen him expose himself. At the subsequent trial Temple described similarly what she had actually seen in January in Stevenson's when a man came into the store twice:

Q. Well, you say something unusual happened there. How did you first know about it? A. Well, he came into the store acting funny.

Q. All right. Now, this was— A. Nervous.

Q. This was a man that came in the store, right? A. Yes.

. . . .

Q. Okay. And where did you observe him go from there? A. He went to the back of the store.

. . . .

Q. All right. All right. When was your attention next directed to him after he came back a second time? A. I went up to the desk to get something for marking, and I noticed him in the mirror.

. . . .

Q. Okay. And what caught your attention to him then after he came back a

second time? A. I noticed him in the mirror kneeling down.

. . . .

Q. And what did you do when you saw that? A. I was shocked so I turned away.

. . . .

Q. And, in your own words, what was he doing? A. He was—had his hands on top of himself.

. . . .

Q. And where in relation to his genitals were his hands? A. They were right on top.

Q. All right. From your vantage point, can you tell whether or not his zipper was zipped up or zipped down? A. I couldn't tell you.

Q. From your vantage point, could you tell whether his penis were exposed or were not exposed? A. I couldn't tell.

Q. Okay. And was there movement of his hands? A. Yes, there was.

Q. As best you can describe, what was the movement of his hands? A. He was rubbing up and down.

Q. In what area? A. In the genitals.

The day after the arrest Dunn discussed the exposure problem with Burton and Police Chief Gordon. Gordon advised Dunn to consult with the county attorney before proceeding further.

Before talking to the county attorney, however, Dunn and Burton showed photographs of Children to Sherry Tweed, Spurgeon's clerk. Tweed could not positively identify Children but she said, "That certainly looks like the man." Burton relayed this information to County Attorney Ronald K. Noah, who advised Burton that he did not think a charge could be filed for the Stevenson's incident but that one could be filed for the Spurgeon's incident.

A complaint was then filed against Children for the incident at Spurgeon's on January 25, 1979. The county attorney investigated the charge but dismissed it about two months later. Eventually, another man was arrested and convicted of the exposures. Children then brought this damage action against Dunn, Burton, and the city.

■ I. *False arrest.* This is a false arrest case, not a malicious prosecution case. *See Ashland v. Lapiner Motor Co.,* 247 Iowa 596, 75 N.W.2d 357 (1956) (malicious prosecution based on charge filed before justice of peace). A false arrest case involving the issue of probable cause turns on what the officer knew at the time of arrest, not what he learned later. Much of the evidence and argument Children presses upon us would go to a malicious prosecution claim but is not relevant on the *liability* issue in a false arrest claim.

■ A false arrest is one way of committing the tort of false imprisonment—restraining freedom of movement. Prosser, *Law of Torts* 42 (4th ed. 1971) ("The action for the tort of false imprisonment, sometimes called false arrest, is another lineal descendent of the old action of trespass. It protects the personal interest in freedom from restraint of movement."); *Norton v. Mathers,* 222 Iowa 1170, 1175, 271 N.W. 321, 323 (1937) ("This is a case of false arrest and imprisonment"); *Fox v. McCurnin,* 205 Iowa 752, 757, 218 N.W. 499, 501 (1928) ("although plaintiff has alleged false arrest in count 2 and false imprisonment in count 3, they are not distinguishable, and therefore amount only to a charge of false imprisonment").

■ The tort requires confinement of the person. *Restatement (Second) of Torts* §§ 35(1)(b), 36 (1965). If *liability* arose for false arrest in this case, it had to arise within the period commencing with the original arrest of Children and terminating with his release on recognizance. Before and after that period he was not confined. The case is different than those in which the plaintiff was kept in confinement because he was not allowed to post bail. Cases of that kind are found in Annot., 98 A.L.R.2d 966, 1031–36 (1964). *Cf. Neves v. Costa,* 5 Cal.App. 111, 118, 89 P. 860, 863 (1907) (no damages while the person on bail).

■ A. The essential elements of the tort of false arrest are (1) detention or

restraint against one's will and (2) unlawfulness of the detention or restraint. *Valadez v. City of Des Moines,* 324 N.W.2d 475, 477 (Iowa 1982); *Sergeant v. Watson Brothers Transportation Co.,* 244 Iowa 185, 196, 52 N.W.2d 86, 93 (1952); 32 Am.Jur.2d *False Imprisonment* § 5 (1982); 35 C.J.S. *False Imprisonment* § 1 (1960).

■ Once a plaintiff shows a warrantless arrest, the burden of proof shifts to the defendant to show justification for the arrest. *Fox v. McCurnin,* 205 Iowa 752, 759, 218 N.W. 499, 502 (1928); *Snyder v. Thompson,* 134 Iowa 725, 730, 112 N.W. 239, 241 (1907); *Dellums v. Powell,* 566 F.2d 167, 176 (D.C.Cir.1977), *cert. denied,* 438 U.S. 916, 98 S.Ct. 3146, 57 L.Ed.2d 1161 (1978); *Terry v. Zions Cooperative Mercantile Institution,* 605 P.2d 314, 321 (Utah 1979); 35 C.J.S. *False Imprisonment* § 55, at 735 (1960).

■ A peace officer in Iowa may make a warrantless arrest when he has

> reasonable ground for believing that an indictable public offense has been committed and has reasonable ground for believing that the person arrested has committed it.

Iowa Code § 804.7(3) (1979). Indecent exposure is a serious misdemeanor, section 709.9, and therefore is an indictable offense. Iowa Code § 801.4(13) (indictable offense is an offense other than a simple misdemeanor). The question is thus whether Officer Dunn, when he arrested and detained Children, had reasonable ground for believing the offense of indecent exposure had been committed by Children.

■ B. The expression "reasonable ground" is equivalent to traditional "probable cause." *State v. Mattingly,* 220 N.W.2d 865, 868 (Iowa 1974); *United States v. Berryhill,* 466 F.2d 621, 624 (8th Cir.), *cert. denied,* 409 U.S. 1046, 93 S.Ct. 547, 34 L.Ed.2d 498 (1972). As stated in *Brinegar v. United States,* 338 U.S. 160, 175–76, 69 S.Ct. 1302, 1310–11, 93 L.Ed. 1879, 1890 (1948):

> Probable cause exists where 'the facts and circumstances within their [the officers'] knowledge, and of which they had

reasonably trustworthy information, [are] sufficient in themselves to warrant a man of reasonable caution to the belief that' an offense has been or is being committed.

*See also Draper v. United States,* 358 U.S. 307, 313, 79 S.Ct. 329, 333, 3 L.Ed.2d 327, 332 (1959); *United States v. McCulley,* 673 F.2d 346, 351 (11th Cir.1982).

■ The test is a "reasonable" ground, not absolute certainty. 6A C.J.S. *Arrest* § 22, at 54 (1976) ("a liberal rather than a strict course should be followed"); § 23, at 56 ("Probable cause necessary to support warrantless arrest does not demand the same strictness of proof as proof of guilt upon trial."); § 24, at 58–59 ("In determining the presence of probable cause for arrest, the courts deal with the probabilities and only the probability, and not a prima facie showing of criminal activity is the standard for probable cause. The probabilities are not technical, but are factual and practical considerations of everyday life on which reasonable and prudent men, not legal technicians, act. Probable cause does not require absolute certainty beyond reasonable doubt that a crime is being or has been committed by the person to be arrested; the existence of probable cause is not determined by any analysis of an extent of subjective certainty or processes of the arresting officer, but by an objective standard of reasonableness."). Probable cause can rest on hearsay. 5 Am.Jur.2d *Arrest* § 46, at 738 (1962); 6A C.J.S. *Arrest* § 23, at 56 (1972) ("Reasonable or probable cause for arrest is not limited to evidence which would be admissible on the issue of guilt, but it may be based on hearsay information.").

■ When an officer acts with probable cause, he is protected even though the person arrested turns out to be innocent. *State v. Ricehill,* 178 N.W.2d 288, 291 (Iowa 1970), *cert. denied,* 401 U.S. 942, 91 S.Ct. 945, 28 L.Ed.2d 222 (1971); *Henry v. United States,* 361 U.S. 98, 102, 80 S.Ct. 168, 171, 4 L.Ed.2d 134, 138 (1959).

Probable cause must be determined on the particular facts in each case. *State v. Harvey,* 242 N.W.2d 330, 340 (Iowa 1976); *State v. Evans,* 193 N.W.2d 515, 517 (Iowa 1972). The significant point is that courts look to the facts within the officers' knowledge *at the time the arrest was made. State v. Vallier,* 159 N.W.2d 406, 408 (Iowa 1969); *State v. Raymond,* 258 Iowa 1339, 1344, 142 N.W.2d 444, 447 (1966); *Beck v. Ohio,* 379 U.S. 89, 91, 85 S.Ct. 223, 225, 13 L.Ed.2d 142, 145 (1964); *United States v. Tinkle,* 655 F.2d 617, 621 (5th Cir.1981), *cert. denied,* 455 U.S. 924, 102 S.Ct. 1285, 71 L.Ed.2d 467 (1982); *United States v. Bernard,* 623 F.2d 551, 559 (9th Cir.1979); *United States v. Regan,* 525 F.2d 1151, 1155 (8th Cir.1975); *United States v. Trabucco,* 424 F.2d 1311, 1314 (5th Cir.), *cert. denied,* 399 U.S. 918, 90 S.Ct. 2224, 26 L.Ed.2d 785 (1970). Facts that occur or come to light subsequent to the arrest are irrelevant to a determination of whether probable cause existed at the time of arrest. *Henry v. United States,* 361 U.S. 98, 103, 80 S.Ct. 168, 171, 4 L.Ed.2d 134, 139 (1959). As stated in 5 Am.Jur.2d *Arrest* § 48, at 740–41 (1962):

The existence of 'probable cause,' justifying an arrest without a warrant, is determined by factual and practical considerations of everyday life on which reasonable and prudent men, not legal technicians act. It is a pragmatic question to be determined in each case in the light of the particular circumstances and the particular offense involved.

Probable cause does not depend on the actual state of the case in point of fact, as it may turn out upon legal investigation, but on knowledge of facts and circumstances that would be sufficient to induce a reasonable belief in the truth of the accusation. It depends on the facts known, at the time of the arrest, to the person by whom the arrest is made, from which it follows that an arrest cannot be justified by what a subsequent search discloses. On the other hand, if probable cause existed at the time of the arrest, the fact that investigation proves the person arrested to be innocent does not make the arrest unjustifiable.

In determining probable cause, all the information in the officer's possession, fair inferences therefrom, and observations made by him, are generally pertinent; and facts may be taken into consideration that would not be admissible on the issue of guilt.

And as stated in 6A C.J.S. *Arrest* § 25b, at 61–62 (1975):

Conversely, events subsequent to a warrantless arrest will not remove probable cause that existed when the arrest took place. Thus if probable cause exists for an arrest the fact that no crime has been committed, that there is a probability of release of the arrested person, that there has been a dismissal of charges or an acquittal does not affect the legality of the initial arrest.

Probable cause to arrest without warrant is not dispelled by the officer's learning additional facts upon returning to the station house. *People v. Wolfe,* 5 Mich.App. 543, 552, 147 N.W.2d 447, 452 (1967).

C. In dealing with civil damage actions for false arrest, courts apply a probable cause standard less demanding than the constitutional probable cause standard in criminal cases. If the officer acts in good faith and with reasonable belief that a crime has been committed and the person arrested committed it, his actions are justified and liability does not attach. *O'Neill v. Keeling,* 227 Iowa 754, 758, 288 N.W. 887, 889 (1939); *Greer v. Turner,* 639 F.2d 229, 231–32 (5th Cir.1981); *Dellums v. Powell,* 566 F.2d 167, 175 (D.C.Cir.1977), *cert. denied,* 438 U.S. 916, 98 S.Ct. 3146, 57 L.Ed.2d 1161 (1978); *Hill v. Rowland,* 474 F.2d 1374, 1377 (4th Cir.1973); *Wilcox v. United States,* 509 F.Supp. 381, 384–85 (D.C.C. 1981); *Gueory v. District of Columbia,* 408 A.2d 967, 969 (D.C.App.1979); *Mitchell v. Drake,* 172 Ind.App. 376, 381–82, 360 N.E.2d 195, 198 (1977); *Terry v. Zions Cooperative Mercantile Institution,* 605 P.2d 314, 320–21 (Utah 1979); *Town of Jackson v. Shaw,* 569 P.2d 1246, 1250 (Wyo.1977). The court stated in *Bivens v. Six Unknown Named Agents of the Federal Bureau of Narcotics,* 456 F.2d 1339, 1348 (2nd Cir.1972):

The numerous dissents, concurrences and reversals especially in the last decade indicate that even learned and experienced jurists have had difficulty in defining the rules that govern a determination of probable cause, with or without a warrant. As he tries to find his way in this thicket, the police officer must not be held to act at his peril. Therefore, to prevail the police officer need not allege and prove probable cause in the constitutional sense. The standard governing police conduct is composed of two elements, the first is subjective and the second is objective. Thus the officer must allege and prove not only that he believed, in good faith, that his conduct was lawful, but also that his belief was reasonable. And so we hold that it is a defense to allege and prove good faith and reasonable belief in the validity of the arrest.

II. *Motions for directed verdict and judgment notwithstanding verdict.* We proceed, then, to the question of liability.

A. Before the trial court submitted the case to the jury, defendants moved for a directed verdict. After the jury returned its verdict, defendants moved for judgment notwithstanding verdict (and new trial). Defendants asserted throughout that Dunn had probable cause as a matter of law to arrest Children. The trial court overruled the motions. On review of these rulings, we view the evidence in the light most favorable to Children. *Valadez v. City of Des Moines,* 324 N.W.2d 475, 477 (Iowa 1982) (quoting *Watson v. Lewis,* 272 N.W.2d 459, 461 (Iowa 1978)); Iowa R.App.P. 14(f)(2).

If the pertinent facts on the issue of probable cause were in dispute, the issue was for the jury to decide. The motions for directed verdict and judgment notwithstanding verdict would then be properly denied. *Drake v. Keeling,* 287 N.W. 596, 597 (Iowa 1939); *Snyder v. Thompson,* 134 Iowa 725, 727, 112 N.W. 239, 240 (1907); *Smiddy v. Varney,* 665 F.2d 261, 265 (9th Cir.1981); *May Department Stores Co., Inc. v. Devercelli,* 314 A.2d 767, 772 (D.C.1974); *Weissman v. K-Mart Corp.,* 396 So.2d 1164,

1166–67 (Fla.Dist.Ct.App.1981); *Diaz v. Lockheed Electronics,* 95 N.M. 28, 31, 618 P.2d 372, 374 (1980); *Terry v. Zions Cooperative Mercantile Institution,* 605 P.2d 314, 320 (Utah 1979). If the pertinent facts were not in dispute, however, determination of justification was for the court. *Comstock v. Maryland Casualty Co. of Baltimore,* 179 N.W. 962, 965 (Iowa 1920); *Woodward v. District of Columbia,* 387 A.2d 726, 728 (D.C.App.1978); *Stienbaugh v. Payless Drug Stores, Inc.,* 75 N.M. 118, 122, 401 P.2d 104, 106 (1965); *McGillivray v. Siedschlaw,* 278 N.W.2d 796, 799 (S.D.1979); *Terry* at 320; 5 Am.Jur.2d *Arrest* § 49 (1962).

█ B. In the case before us, the record is replete with happenings after Children was released. These happenings would be pertinent on liability for malicious prosecution but they do not create liability in the false arrest action for two reasons: first, because Children was not confined at or after the times of these happenings and second, because of the rule in section 136 of the *Restatement (Second) of Torts* (1965):

> Any subsequent misconduct of one who has taken custody of another by a privileged arrest makes him subject to liability to the other only for such harm as is caused by such misconduct, and does not make him liable for the arrest, or for detention prior to the misconduct.

The evidence introduced by both sides overwhelmingly shows that several exposure incidents had occurred in the mall and that Dunn was aware of them and of the reports in the police records. To confine his background information to the Temple incident of January 25th would be too narrow; his knowledge was broader than that. He also knew that Temple had reported one of the incidents.

Dunn received calls from the dispatcher, first, of an intoxicated person at the mall, and then, that the alleged intoxicated person was the exposure suspect. Dunn went to the mall, discovered that the person was not intoxicated, and did not arrest him.

Hawk then said to Dunn, "What'd you leave him go for? He's the flasher. June recognized him."

Dunn did not arrest on this information either. He went to Stevenson's and asked Temple, "Are you sure it's him?" She answered, "Yes, yes, I'm sure."

Still Dunn did not make an arrest. He took Temple to the car, knocked on the door or window, and asked her, "Is this the man that was in the store?" She answered, "Yes." Dunn then arrested Children.

Officers confronted with situations such as this one must make a decision. They do not have the luxury of detached reflection before they act. Nor can they conduct extensive investigation and cross-examination out on the street, to see that all the legal elements of the crime are satisfied. They should be judged in the context of the real world in which they must function. We hold that this arrest was on probable cause.

■ Having lawfully arrested Children, Dunn had a right to process the arrest and arrange for bail. This he did with the help of Burton. Temple adhered to her identification but another of the clerks disagreed. The workup of the evidence in the case would obviously take time. That first evening was preliminary—taking the person into custody and arranging bail. These preliminaries took an hour and twenty minutes. We hold that this retention, following the lawful arrest, was also lawful.

We realize that Children suffered grievously from a mistake, but his claim founded on false arrest is untenable. On the liability issue, we cannot allow our attention to be diverted to events which happened after Children was released. The trial court should have sustained the motion for directed verdict or the subsequent motion for judgment notwithstanding verdict.

REVERSED.

All Justices concur except HARRIS, LARSON, and CARTER, JJ., who dissent.

HARRIS, Justice, dissenting.

The majority concludes as a matter of law there was probable cause for Children's arrest. It does so after an exhaustive review of the facts. The jury, however, on proper instructions, found the facts to be otherwise. We have said:

In ruling on a motion for directed verdict, the evidence must be viewed in the light most favorable to the party against whom the motion was made, regardless of whether it was contradicted; moreover, a court must draw every legitimate inference in aid of the evidence. If reasonable minds could differ on the issue, it should be submitted to the jury. *See* Iowa R.App.P. 14(f)(2), (17); *Larsen v. United Federal Savings & Loan Association*, 300 N.W.2d 281, 283 (Iowa 1981); *Beitz v. Horak*, 271 N.W.2d 755, 757 (Iowa 1978); *Curran Hydraulic Corporation v. National-Ben Franklin Insurance Company*, 261 N.W.2d 822, 823 (Iowa 1978).

*Kooyman v. Farm Bureau Mut. Ins. Co.,* 315 N.W.2d 30, 34 (Iowa 1982). It seems clear to me that reasonable minds *could* differ on the existence of probable cause here. Therefore, the issue was properly for the jury to determine.

The evidence is simply not as compelling as the majority indicates. Contradictions abound. The majority quotes and relies on June Temple's testimony of what she told Officer Burton: "I just had some guy expose himself to me." The majority further quotes her testimony:

Q. I see. Did you or did you not tell him [Burton] that there was a man in there that exposed himself or words to that effect? [Objection, ruling.] The Witness: Yes, I did.

But Temple contradicted this when she was cross-examined:

Q. Okay. Did Officer Dunn say to you in sum and substance, "Did you see this man's genitals or his penis or anything of that nature?" A. I don't remember.

Q. Well, this is important now. Do you remember him asking you that? A. No, I don't.

Q. All right. Do you remember telling him at that time that, yes, I did see the man's penis or genitals? A. No.

Q. In fact, you never did tell him that, did you? A. No.

Q. And you never told Mr. Burton that either, had you, prior to that time? A. No, I didn't.

The jury could have found that Dunn arrested Children solely as the person who allegedly exposed himself at Stevensons on January 25. Dunn's answer to the petition and testimony both concede this: "In further answer to plaintiff's petition, this defendant states that the plaintiff's arrest was based upon an incident happening at the Stevenson store in Charles City, Iowa, on the 25th day of January 1979." Dunn testified to the same effect:

Q. Okay. But you had to arrest him for indecent exposure some place. Where were you arresting him? Where was the place that you claimed at that point before you arrested him where he'd made an indecent exposure? Where? A. Stevensons in the Cedar Mall.

The jury could also have found that Dunn made the arrest without first ascertaining from Temple that Children had actually exposed himself on that occasion. Again, Dunn admitted this in his testimony:

Q. And June Temple had never told you that she had actually seen any exposure prior to April the 8th, 1979; isn't that true? A. Yes, that is right.

Q. And on April the 8th, 1979, before you arrested Mr. Children, you never asked her whether she'd seen an exposure either, did you? A. Yes, that is correct.

Q. Yes. That is correct, you didn't ask her? A. Yes.

Dunn conceded that he had insufficient probable cause to arrest Children after first determining that Children was not intoxicated, despite the dispatcher's report that Children was the flasher suspect. The jury could therefore have concluded that Dunn did not have reasonable grounds to believe that an exposure had occurred on January 25, and that his arrest of Children, based solely on *that* incident, was unlawful.

We have said that it is "for the *jury* to pass upon [conflicting testimony] under proper instructions from the court." *Jettre v. Healy,* 245 Iowa 294, 298, 60 N.W.2d 541, (1953) (emphasis added). The trial court

should not be reversed for sending the disputed questions to the jury.

I would affirm.

LARSON, and CARTER, JJ., join this dissent.